Lionel Z. Glancy (SBN 134180)
Robert V. Prongay (SBN 270796)
Casey E. Sadler (SBN 274241)
Pavithra Rajesh (SBN 323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
lglancy@glancylaw.com
rprongay@glancylaw.com
csadler@glancylaw.com
prajesh@glancylaw.com

*Lead Counsel for the Class*
[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| STEPHEN LOPES, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FITBIT, INC., JAMES PARK and WILLIAM ZERELLA,<br><br>Defendants. | Case No.: 3:18-cv-06665-JST<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JUDGE:    Hon. Jon S. Tigar<br><br>Date Action Filed: November 1, 2018 |

1

## <u>**TABLE OF CONTENTS**</u>

2

I.     NATURE OF THE ACTION...........................................................................1

II.    JURISDICTION AND VENUE.....................................................................6

III.   PARTIES.......................................................................................................7

IV.    STATEMENT OF FACTS.............................................................................9

      A.    Company Background.......................................................................9

      B.    Fitbit Desperately Tried to Convince Investors that Its Fitness Trackers Were Not Just a "Fad" and that New Products Would Drive Revenue Growth into the Holidays .............................................................................................11

      C.    Fitbit Concealed to Investors that It Lacked a Battery for Its Flex 2 and Thus that Shipments Were Delayed, Supply Was Constrained and the Product Was Not Functional......................................................................................13

            1.    Defendants Failed to Disclose that the Flex 2 Could Not Be Shipped on Time and in Sufficient Quantities Due to the Lack of Battery ...............................13

            2.    Fitbit Touted the Features, Technical Achievements, Market Opportunities and Accuracy of the Flex 2 but Failed to Disclose that the Flex 2 Did Not Have a Battery ...............................................................................15

      D.    Defendants Misled the Public About the Success of the Charge 2 ...........................16

            1.    Fitbit Touted the Features, Technical Achievements, Market Opportunity and Accuracy of the Charge 2 But Failed to Disclose that It was Plagued with Bugs and/or Defects .................................................................16

            2.    Park Falsely Reassured the Market that Analysts' Channel Checks Showing an Accumulation of Charge 2 in the Channels Were Unreliable ..................17

            3.    Defendants Failed to Disclose the Accumulated Inventory of the Charge 2 When It Lowered and Restated the Guidance Due to The Flex 2 Battery Issue and Some Softness in Demand and Restated the Guidance ...........................19

V.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE WITH SCIENTER DURING THE CLASS PERIOD .........................................21

      A.    Q216 Earnings Announcements (August 2, 2016)..................................22

| | | | |
|---|---|---|---|
| | 1. | False and/or Misleading Statement Regarding Revenue and Margin Growth | 22 |
| | 2. | Fitbit's Boilerplate Risk Disclosures Were Materially Misleading | 26 |
| B. | | New Product Launch Announcement (August 29, 2016) | 27 |
| | 1. | False and or Misleading Statements Reaffirming the Guidance and the Shipment Date of the Flex 2 | 27 |
| | 2. | False and/or Misleading Statements Regarding Flex 2 Product Features and Competitive Strength | 29 |
| | 3. | False and/or Misleading Statements Regarding the Charge 2 Quality  Control Issues | 33 |
| C. | | September 2016 Roadshows | 35 |
| D. | | Park's *Mad Money* Interview (October 6, 2016) | 39 |
| E. | | Post-Black Friday Investor Presentation | 43 |

VI.    ADDITIONAL SCIENTER ALLEGATIONS ........................................................ 47

A.    The Company's 2016 Financial Success Was Tied to the Sale of Its New Products During the Holiday Season ........................................................................ 48

B.    Fitbit Executives Were Promptly Informed of the Defects with Fitbit's Products ........................................................................................................ 50

VII.   MARKET EFFICIENCY, DAMAGES AND LOSS CAUSATION.................................... 50

A.    Market Efficiency ............................................................................................ 51

B.    Representative Corrective Events .................................................................... 52

1.    November 2, 2016 Corrective Event ............................................... 53

2.    January 10, 2017 Corrective Event ................................................. 55

3.    January 30, 2017 Corrective Event ................................................. 56

VIII.  CLASS ACTION ALLEGATIONS.................................................................. 58

FIRST CLAIM .................................................................................................. 59

SECOND CLAIM ................................................................................................................ 62

PRAYER FOR RELIEF ..................................................................................................... 63

JURY TRIAL DEMANDED ............................................................................................... 63

Lead Plaintiff Irving Lubman ("Lead Plaintiff"), Stephen Lopes and Richard Chester (together, "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based on, among other things, their counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Defendant Fitbit, Inc. ("Fitbit" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued by and disseminated by the Company; (c) a review of other publicly available information concerning the Company; and (d) other sources of information deemed reliable.

# I.      NATURE OF THE ACTION

1.      This is a securities class action on behalf of a class consisting of all those who purchased Fitbit securities between August 2, 2016 and January 30, 2017, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Fitbit manufactures and provides wearable fitness-tracking devices worldwide. Its products purport to monitor a user's fitness level by tracking daily activity statistics, such as heart beat, steps taken, pace, distance traveled, calories burned, stairs climbed, and time spent in sleep. Although Fitbit designs its products in California, it outsources the production of each of its devices to original equipment manufacturers, primarily through a single contract manufacturer in Asia. The manufacturers are in turn responsible for procuring most of the components used in the manufacturing of its products from a limited number of third-party suppliers, which results in lengthy lead times to manufacture and ship Fitbit's products.

3.      In June 2015, Fitbit went public, but soon thereafter, it was faced with a host of issues and its stock started to decline over concerns that its products were just a fad. By the start of the Class Period, Defendants were desperate to demonstrate strong revenue growth and to regain investor confidence. They did so by dramatically increasing the number of new product offerings in

2016, introducing two new products in the spring of 2016 (Alta and Blaze), and quickly following that up with two more new products for the 2016 holiday season, the Charge 2 and the Flex 2.

4.      On August 2, 2016, the start of the Class Period, the Company forecast $2.5 to $2.6 billion revenue for fiscal 2016, which reflected expected revenue from the sale of the Charge 2 and the Flex 2. Fitbit's Chief Financial Officer ("CFO"), William Zerella, told investors that both of the new products would ship "in the latter part of Q3 2016" and that Defendants "expect[ed] to enter the holiday season with the most compelling lineup of new products than any previous holiday period."

5.      On August 29, 2016, Fitbit's Director of Product Marketing, Melanie Chase, officially introduced the new products and reaffirmed the financial guidance provided earlier that month. She touted the features and technical achievements of the Flex 2, including its long battery life, waterproof feature and slim design. The Flex 2, she stated, represented a "large core and category growth opportunity" because of its appeal to two new category of users: women due to its small size and swimmers due to its waterproof feature. Thereafter, in a series of investor conferences (a/k/a roadshows) in September, Fitbit's Vice President of Investor Relations, Brad Samson, repeatedly reaffirmed the Company's guidance provided on August 2, while touting the long battery life, accuracy, and new features of the Flex 2.

6.      The statements made in August and September 2016 regarding the guidance, the shipping time of the Flex 2 and its features, technical achievements, accuracy and market opportunity were false and misleading, however, because the Company had not yet even sourced a battery for the Flex 2, meaning the new product would not be available in time for the 2016 holiday season. This production issue was not revealed until November 2, 2016 when Defendants lowered guidance and blamed the lack of battery for delaying shipment of the product and causing "$50 million in unsold demand."

7.      The August 2 guidance was premised, in part, on the expectation that the Flex 2 would be shipped on time at the end of the quarter and in sufficient quantities to meet the demand upon which the guidance was based. Without a battery and given the long lead times to source components, Defendants knew at the time they made these statements that the Flex 2 would not ship

on time and that Fitbit would experience supply constraints. Thus, they had no reasonable basis for stating and reaffirming that the product would ship on time and for providing and reaffirming guidance that failed to take into account the lack of battery, delayed shipment and supply constraints of one of its key holiday products, the Flex 2. Moreover, Chase's and Samson's characterizations of the Flex 2's waterproof feature, long battery life, accuracy, slimness, and appeal to the new categories of users were likewise misleading as they all depended on the product having a working battery, which it admittedly did not as of the time those statements were made.

8.      Defendants also misled investors about the features and prospects for the other new device Fitbit introduced for the 2016 holiday season, the Charge 2. At the August 29, 2016 new product introduction, and again during the September roadshow presentations, Fitbit had similarly touted the features and technical achievements of the Charge 2, including its accuracy, pace and distance tracking. But Fitbit failed to disclose that the product was plagued with bugs and/or defects that caused statistics such as distance and pace tracking to be calculated inaccurately, as subsequently admitted when Fitbit released a software update a month after the product began shipping to fix those issues. Thus, Defendants knew, by the time of those statements, that the market opportunity for that product was similarly not as favorable as portrayed to investors.

9.      The foregoing statements primed investors to anticipate a strong holiday season for the Company. On September 29, 2016 – just two weeks after the Charge 2 had started shipping – an analyst issued a note stating that the Company's retailers had "more than two weeks of inventory [] on hand," indicating that sales of the Charge 2 were "off to a slow start." Defendants immediately worked to undermine the reliability of this report, suggesting that the inventory build was due to the early shipment of the product (while still failing to disclose the delayed shipment of Flex 2), and reaffirming expectations for strong holiday sales of the product.

10.      On October 6, 2016, just one week after the analyst report was issued, Fitbit's Chief Executive Officer ("CEO") James Park went on CNBC's *Mad Money* hosted by Jim Cramer to dispel this negative analyst report. During the interview, Park reassured investors by suggesting that

the analyst's channel checks were not credible because the Charge 2 had "just started shipping" and asserting that the Charge 2 was the "number 1 bestselling fitness tracker on Amazon."

11.     In reality, Park knew or recklessly disregarded and failed to disclose that inventory of the Charge 2 was, in fact, building beyond sustainable levels in October 2016, as Park and Zerella revealed on the November 2, 2016 earnings call, and that demand for the product had already flattened by October 2016, as Zerella admitted on a December 6, 2016 presentation to investors.

12.     Less than a month after Park's interview, on November 2, 2016, the Company lowered its full-year revenue guidance by more than $150 million, from a range of $2.5 and $2.6 billion to a range of $2.320 and $2.345 billion, leading Cramer to publicly question Park's credibility. During a November 3, 2016, appearance on CNBC's *Squawk on the Street*, Cramer called the situation "a travesty" since, when he confronted Park about the analyst report showing Charge 2 sales had dropped, Park had "dismissed them out of hand, referring to how well his products were doing on Amazon." Cramer said that Park "has lost any credibility" and that "Fitbit is now done."

13.     The Company also issued fourth quarter revenue guidance of $725 to $750 million on November 2, 2016, which was significantly below the $985 million guidance previously implied on August 2. On that same day, Zerella admitted that the revenue "shortfall" was driven by a few factors, including "softness in overall demand" and the Company's lack of a battery for the Flex 2 in Q3 2016, which had caused "supply constraints, which we expect will result in approximately $50 million of unsold demand."

14.     On this news, Fitbit's common stock fell $4.30 per share, or 33.6%, to close on November 3, 2016 at $8.51 per share, on unusually heavy trading volume.

15.     Although the November 2, 2016 disclosures revealed for the first time the battery issues with the Flex 2 and the delays, supply constraints and the impact on sales and guidance these production issues had engendered, as well as some general softness in demand, they were only partially revealing because they still failed to disclose: (i) the accumulation of inventory of Charge

2; (ii) the lower reorders of the Charge 2; and (iii) the extent to which demand for both new products was still not in line with expectations.

16.     Nevertheless, on December 6, 2016, Zerella reaffirmed the guidance provided on November 2, 2016 and stated that Fitbit was still on track to meet its lower guidance with "a few more pretty big weeks" coming up to sell products. Unbeknown to investors, however, the Company had failed to receive anticipated Black Friday reorders – the primary indicator of strong demand for its products – as Park and Zerella later admitted on the February 22, 2017 earnings call. Defendants admitted on the call that reorders had not occurred despite increased promotional activity, and that the shipments that were being made during this period were primarily based on non-binding pre-purchase commitments that had been made in the fall, before the products were available for sale. Because sales had not been in line with expectations, inventory had accumulated beyond sustainable levels in the channels. In fact, Park subsequently admitted on February 22, 2017 that following lackluster Black Friday sales, the Company had continued and increased its promotional activity because it knew demand was already lagging.

17.     Then, on January 10, 2017, an analyst issued a note on Fitbit stating that "[t]here are some concerns partners may not get paid for all of the product they have built because demand is so weak. . . . Partners had to completely stop production for Fitbit because they are swimming in product."

18.     On this news, Fitbit's common stock declined $0.46 per share, almost 6%, to close on January 10, 2017 at $7.33 per share, on unusually heavy trading volume.

19.     This disclosure revealed that demand for the new products was so weak that there were concerns Fitbit's partners would not be paid and that inventory of the Charge 2 was so high Fitbit had to halt production. However, the disclosure was again only partially revealing as it did not reveal that restocking orders had been lower than expected and that holiday demand, including during Black Friday, had been very weak despite the increased promotional activity, such that the demand for Fitbit's products was much lower than revealed on the conference call and that Fitbit's sales had dropped significantly.

20.     It was not until January 30, 2017 that Fitbit revealed the full extent of the lack of demand for its new products, and lowered its full-year 2016 guidance for revenue growth to "approximately 17% from the previous forecasted growth of 25% to 26%" and lowered its fourth quarter revenue guidance from $725-$750 to $572-$580 million, blaming the "softer-than-expected holiday demand for trackers in our most mature markets, especially during Black Friday… ."

21.     On this news, Fitbit's common stock declined by $1.15 per share, or 15.95%, to close on January 30, 2017 at $6.06 per share, on unusually heavy trading volume.

22.     Defendants acted with scienter and must be held accountable for their wrongful acts and omissions which, as the true facts came to light, were the cause of a significant decline in the market value of the Company's securities. Plaintiffs and other Class members have suffered significant losses and damages at the hands of Defendants and are entitled to redress.

## II.     JURISDICTION AND VENUE

23.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

25.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, the Company's principal executive offices are located in this Judicial District.

26.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.    PARTIES

27.    Lead Plaintiff Irving Lubman, as set forth in the certification previously filed with the Court (Dkt. No. 27-2), purchased Fitbit securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

28.    Plaintiff Stephen Lopes, as set forth in the certification previously filed with the Court (Dkt. No. 1), purchased Fitbit securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

29.    Plaintiff Richard Chester, as set forth in the certification attached hereto as Exhibit A, purchased Fitbit securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

30.    Defendant Fitbit is a Delaware corporation that trades on the New York Stock Exchange ("NYSE"), with its principal executive offices located at 199 Fremont Street, 14th Floor San Francisco, California 94105. During the Class Period, Fitbit, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's securities.

31.    The Company has established and regularly publicizes the availability of a website at www.Fitbit.com, on which it maintains an Investor Relations section where SEC filings, press releases, conference call recordings, investor presentations, financial statements and information, corporate governance policies, descriptions of its business, and other information about the Company is made available to investors.

32.    Among those whose scienter may be imputed to Fitbit in addition to the Individual Defendants are:

(a) Melanie Chase ("Chase"), Fitbit's Director of Product Marketing, beginning on October 2013; and

(b) Brad Samson ("Samson"), Fitbit's Vice President of Investor Relations since September 2015 through the end of September 2016.

33. Defendant James Park was Fitbit's Co-Founder, President, CEO and Chairman of Fitbit's Board of Directors at all relevant times. As CEO, Park had a duty to authorize or approve the information, and was regularly quoted, in Fitbit's press releases, regularly spoke on Fitbit's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, regularly made live presentations at analyst-sponsored investor conferences, and signed or authorized all of Fitbit's reports filed with the SEC. Park founded Fitbit in 2007.

34. Defendant William Zerella was Fitbit's CFO and held that position throughout the Class Period. Zerella had a duty to authorize and approve the information in Fitbit's press releases, regularly spoke on Fitbit's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, made live presentations at analyst-sponsored investor conferences, and signed or authorized all of Fitbit's reports filed with the SEC. Zerella joined Fitbit in June 2014. He previously was the CFO of a few other publicly-traded companies.

35. Defendants Park and Zerella are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Fitbit's reports to the SEC, press releases and public presentations to securities analysts, money and portfolio managers and institutional investors. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

36.     During the Class Period, the Individual Defendants participated in the issuance of, signed, and/or certified as accurate the Company's public statements and periodic reports with the SEC, including:

- The press release attached to the Form 8-K filed with the SEC on August 2, 2016 ("Q2 2016 Form 8-K") and the Form 10-Q filed with the SEC on August 4, 2016 ("Q2 2016 Form 10-Q"); and

- The press release attached to the Form 8-K filed with the SEC on November 2, 2016 ("Q3 2016 Form 8-K") and the Form 10-Q filed with the SEC on November 4, 2016 ("Q3 2016 Form 10-Q").

37.     As alleged herein, certain of these SEC filings contained material misrepresentations and omissions when issued. In addition, throughout the Class Period, the Individual Defendants participated in the Company's quarterly and/or annual earnings conference calls wherein they made material misrepresentations, omitted material information, or failed to correct the material misstatements or omissions of others.

## IV.     STATEMENT OF FACTS

### A.     Company Background

38.     Fitbit was founded in 2007 by Park and Chief Technology Officer ("CTO") Eric Friedman. Fitbit manufactures and provides wearable fitness-tracking devices worldwide. Its products purport to monitor a user's fitness level by tracking daily activity statistics, such as steps taken, pace, distance traveled, heart rate, calories burned, stairs climbed, and time spent in sleep. At the start of the Class Period, the Company described itself as the leader in the connected health and fitness category that designs products and experiences that track everyday health and fitness.

39.     Fitbit's diverse line of award-winning products at the start of the Class Period included the Fitbit SurgeTM, the Fitbit BlazeTM, the Fitbit Charge HRTM, the AltaTM, the Fitbit ChargeTM, the Fitbit Flex®, the Fitbit One® and the Fitbit Zip® activity trackers, as well as the Aria® Wi-Fi Smart Scale. The Company generates substantially all of its revenue from sales of its connected health and fitness devices. According to the Company, at the start of the Class Period, it

sold its products in over 54,000 retail stores and in 64 countries, through its retailers' websites, its online store and as part of its corporate wellness offering.

40.     As explained in its Q2 2016 Form 10-Q, the Company designs its products in California and outsources the production of its devices to contract manufacturers, which are responsible for procuring most of the components used in the manufacturing of its products from third-party suppliers. Fitbit relies on a limited number of contract manufacturers, third-party suppliers and logistics providers. In particular, Fitbit uses contract manufacturers located in Asia, and each of its products is manufactured by a single contract manufacturer. Flextronics is the Company's primary contract manufacturer and was the sole manufacturer of the majority of its devices during the Class Period.

41.     Many of the key components used to manufacture Fitbit's products are purchased by the contract manufacturers on the Company's behalf subject to approved supplier lists, and often come from limited or sole sources of supply. According to the Company, the lead times associated with certain components are lengthy and preclude rapid changes in quantities and delivery schedules.

42.     Zerella acknowledged on the Q3 2016 earnings call on November 2, 2016 that Fitbit "typically [does] heavy shipments in October [and] November . . . " "that support [] Black Friday." These shipments may result from prior "purchase orders," that, according to the Q3 2016 Form 10-Q, "represent authorizations to purchase rather than binding agreements."

43.     Fitbit historically does most of its product discounting and marketing promotions to support Black Friday sales. As Zerella explained on the Q3 2016 earnings call on November 2, 2016, Fitbit "provide[s] a lot of support to [its] channel partners for Black Friday." He said that demand-based reorders typically happen "right after Black Friday" and then "trail[] off pretty significantly" as the holidays come to an end.

**B.**      **Fitbit Desperately Tried to Convince Investors that Its Fitness Trackers Were Not Just a "Fad" and that New Products Would Drive Revenue Growth into the Holidays**

44.      Shortly after completing its initial public offering in June 2015, Fitbit was beset by a host of issues, including: competition from smart watches such as the Apple Watch released in April 2015; competition from low-cost fitness trackers from suppliers such as China-based Xiaomi; and a lawsuit[1] alleging that the heart-rate monitoring systems on its Charge HR and Surge devices were dangerously inaccurate and posed serious health risks to users. By the end of 2015, Fitbit's share of the wearable market had dropped from 38% in 2014 to 27%.[2]

45.      Presumably to compete against the Apple Watch and similar products, Fitbit announced two new products, a smartwatch called Blaze on January 5, 2016 and a fashion-forward wristband called Alta in February 2016. Although these products sold well, the Company's stock continued to decline amid concerns that fitness trackers were a fad that could not compete against smartwatches.

46.      Against this backdrop, Defendants were desperate to demonstrate strong revenue growth and to regain investors' confidence. They attempted to do so by introducing two new products for the holidays—Charge 2 (an update of the Charge HR) and Flex 2 (an update of the Flex)—thereby introducing four new products during 2016 and revamping and refreshing Fitbit's product line. As repeatedly asserted, these products were expected to continue the strong sales trends demonstrated by Blaze and Alta, thereby demonstrating the continued strength of the fitness tracker product category in the face of competition.

47.      Expected revenue from Charge 2 and Flex 2 were "baked into [Fitbit's] third quarter guidance" and drove the $2.5 to $2.6 billion full-year revenue guidance issued on August 2, 2016. Zerella stated on the Q2 2016 earnings call on August 2, 2016 that Fitbit "expect[ed] to start refilling the channel in the latter part of Q3 2016 in connection with new products for the holidays." He also told investors to expect "strong margin trends on [Fitbit's] new products" in the second half

---

[1]      *See McLellan et al. v. Fitbit, Inc.*, 3:16-cv-00036 (N.D. Cal. Jan. 5, 2016).

[2]      Lance Whitney, *Fitbit still tops in wearables, but market share slips*, C-Net.com, Feb. 23, 2016 (available at https://www.cnet.com/news/fitbit-still-tops-in-wearables-market/).

of 2016. Zerella said that the Company "remain[ed] optimistic for the second half of the year" as the Charge 2 and Flex 2 would ship "in the latter part of Q3 2016" and it "expect[ed] to enter the holiday season with the most compelling lineup of new products than any previous holiday period."

48.     Following the Company's August 2, 2016 earnings call, many analysts reiterated that the Company's new products, which were expected to ship by the end of the third quarter, were catalysts to driving strong sales in the fourth quarter of 2016. For example:

(a)     On August 3, 2016, SunTrust Robinson Humphrey issued an analyst report entitled "Strong 2Q, Setting Up For Solid 4Q." Therein, the report, in relevant part, stated:

> Fitbit plans to refresh most of its legacy products for the holiday season, which we think could reinvigorate revenue growth in 4Q.

> *     *     *

> **Setting Up For Solid 4Q**. Fitbit has been in investment mode in 1H'16, aggressively spending on R&D and marketing. 3Q is seasonally slow and likely will be a transition quarter. Fitbit plans to refresh its product portfolio for the holiday season, which could start as early as the IFA in Berlin in early September (link). Fitbit maintained FY2016 outlook, which implies strong top line acceleration in 4Q driven by new products, and with significant operating leverage. While APAC outlook remains uncertain going into 3Q, we note Fitbit has a history of guiding conservatively, and actual results could be better.

(b)     On the same day, Morgan Stanley issued an analyst report entitled "New Products to Drive Strong Holiday Season." Therein, the report, in relevant part, stated:

> . . . we like FIT (Overweight) heading into the holiday season where wearables will be very popular gifts, and Fitbit remains the category leader and is about to launch new products and accessories.

> ***Fitbit reported 2Q results slight ahead of consensus, and we believe is well positioned heading into the holiday season and beyond***. Blaze and Alta continued to do well in 2Q, growing 50% Q/Q. New products look on track and some retailers are giving Fitbit more shelf space this holiday season. Management sounded confident with the two founders (CEO and CTO) and CFO pledging not to sell shares this year.

> *     *     *

> ***FIT is the wearables play for the seasonally strong 4Q in our view***. While there were some unexpected expenses in 2Q, we do not think that should detract from Fitbit's strong market positioning and upcoming catalysts.[3]

---

[3] All emphasis is added unless otherwise stated.

49.     Following the August 29, 2016 launch of the Charge 2 and Flex 2, analysts again issued numerous reports touting the new products and their impact on year-end revenue. For example:

(a)     On August 29, 2016, Barclays issued an analyst report entitled, "Fitbit: Investors Can Breathe Easier." Therein, the report stated:

> Today Fitbit announced two new product launches, the Charge 2 and the Flex 2. We believe these product launches show FIT's continued focus on innovation. Given its attractive valuation and a robust outlook for future growth supported by new product launches, we remain buyers of the shares of FIT.
>
> We are impressed with the new features in the Charge 2 and Flex 2, which build upon its most popular trackers, the Charge HR and Flex, respectively.

(b)     Morgan Stanley published its own analyst report on August 30, 2016 that likewise touted importance of the holiday season and the impact of the new products on Fitbit's revenue. The report entitled, "New Products to Drive Strong 4Q," stated:

> **We continue to like the stock, driven by new products and a strong 4Q**. Fitness trackers are once again one of the most popular holiday product categories. Fitbit has cemented its leadership position and just refreshed its two most popular products. New software features and new accessories also provide a small boost for existing products. While Apple will most likely refresh the Watch on September 7, we think the market is large enough for both players with limited overlap between these two brands. With FIT trading at 9x P/E and 0.9x EV/sales (lower than GPRO), the risk reward is very attractive, in our view.

50.     In September 2016, Brad Samson, Fitbit's VP of Investor Relations, presented at three investor conferences in New York City where he continued to tout the Company's two new products, the Flex 2 and the Charge 2. During these presentations, Samson reiterated that the Company was on track to meet its guidance for the year.

**C.      Fitbit Concealed to Investors that It Lacked a Battery for Its Flex 2 and Thus that Shipments Were Delayed, Supply Was Constrained and the Product Was Not Functional**

**1.      Defendants Failed to Disclose that the Flex 2 Could Not Be Shipped on Time and in Sufficient Quantities Due to the Lack of Battery**

51.     The August 2, 2016 revenue guidance, which was repeatedly affirmed by the Company throughout August and September, assumed that the Flex 2 would be shipped on time at

the end of the third quarter and in sufficient quantities to meet the demand upon which the guidance was based.

52.     Given that shipments of the Flex 2 were expected to start by the end of the third quarter and that the lead times in sourcing components were very long, production of the Flex 2 was already ramping up by the time of the issuance of Fitbit's Q3 2016 guidance on August 2, 2016, as well as the new products announcement on August 29, 2016 and the investor conferences in September 2016. In fact, retailers had already reviewed early prototypes of the Flex 2 under a Non-Disclosure Agreement before the start of the Class Period, as Park explained on the August 2, 2016 earnings call.

53.     Defendants maintained that the Flex 2 would ship on time. When the August 2, 2016 revenue guidance was issued, Zerella stated that Fitbit would ship the Flex 2 and Charge 2 "in the latter part of Q3 2016." He reiterated, on the August 29, 2016 new products announcement call, that the Company would start to "ship these two new products [in the] latter part of the quarter, [which] is consistent with what we described on our Q2 earnings call" and that "these are being released as previously planned." And during a September 7, 2016 investor roadshow presentation, Samson reaffirmed that the products would ship on time.

54.     However, at the time Defendants made these statements, the Company had not yet even sourced a battery for the Flex 2. Park and Zerella admitted this on the Q3 2016 earnings call on November 2, 2016, when they lowered the fiscal 2016 revenue guidance due to supply constraints of the Flex 2 that resulted in "$50 million in unfulfilled demand." As Zerella explained: "[b]asically, what happened at the end of Q3 was channel inventories went down in Flex, and we weren't able to replenish at the level we anticipated in terms of Flex 2." Park blamed the shipment delay and supply constraints on the lack of battery for the Flex 2 in Q3 2016, stating that "it was incredibly difficult to find batteries that were small enough to fit in the device" and that "[i]t was small enough that we actually had to move to a fully automated production process using robotics to manufacture that product" "[so] there was a lot of things that we had to invent and learn along the way, resulting in you could say a non-optimal initial production process." Thus, Defendants were well aware at the

time that the Flex 2 was beset by manufacturing problems that delayed shipment and made their robust sales projections unlikely to occur.

55.     As Zerella further admitted on the November 2, 2016 earnings call, the Company had incurred "higher-than-expected waste and increased scrap costs" due to "Flex 2 production challenges" which were "basically the reason why we were at the – the scrap charges we took in Q3 were the reason why we ended up at the bottom end of the range on gross margins versus the midpoint or towards the high end." Given the increased production costs of the Flex 2, Defendants were well aware at the time that the strong margin growth trends would not apply to the Flex 2.

56.     Therefore, having concealed to investors that they did not have a battery for its Flex 2 product in Q3 2016 and given the long lead times for its components, Defendants had no reasonable basis to expect that the product would ship in Q3, much less that it would hit retailer shelves in time to support the robust revenues and sales growth that Defendants told investors to expect. Nor did they have a reasonable basis to state that the margin trends on the new products would be strong when at the time, they were incurring increased costs manufacturing the Flex 2.

   **2.     Fitbit Touted the Features, Technical Achievements, Market Opportunities and Accuracy of the Flex 2 but Failed to Disclose that the Flex 2 Did Not Have a Battery**

57.     On the August 29, 2016 new product announcement call, Melanie Chase touted the features, technical achievements and market opportunities of the Flex 2, such as its slim design, swim-proof feature (water resistant up to 50 meters) and five days of battery life. She stated that the Company had been able to shrink down its size through component sourcing. The resulting slim design would appeal to women and the waterproof feature would appeal to swimmers, thus enabling Fitbit to reach two entirely new categories of users. Therefore, Chase said the Flex 2 represented a "large core and category growth opportunity" for Fitbit. During the September 7, 2016 investor presentation, Samson reiterated those representations and on September 14, 2016, he added that Company's products "are already pretty accurate" because Fitbit "spent three years of R&D and testing before we actually brought them to market, so we're pretty confident in them, lawsuits

1   notwithstanding and that limits some of what we can say" and that "[t]here's a continuous R&D
2   cycle going on."

3          58.     However, the waterproof feature, the five days of battery life, the slimness of the
4   product, its accuracy and its appeal to the new categories of users, all depended on the product
5   having a working battery. And as Park and Zerella admitted on the Q3 2016 earnings call on
6   November 2, 2016, Fitbit was unable to source a small enough battery for the waterproof feature in
7   the third quarter. Therefore, without a battery, Defendants had no reasonable basis to state that the
8   product had five days of battery life and was accurate and waterproof. Nor did they have any basis
9   for stating that a nonfunctional device would reach new categories of users. Further, Defendants
10  failed to disclose that the ability to attract new categories of users would be impacted by the
11  significant risk that the Flex 2 would not ship on time and in sufficient quantities to meet demand
12  from these purported new users.

13         **D.      Defendants Misled the Public About the Success of the Charge 2**

14                 **1.      Fitbit Touted the Features, Technical Achievements, Market Opportunity
                           and Accuracy of the Charge 2 But Failed to Disclose that It was Plagued
15                          with Bugs and/or Defects**

16         59.     On the August 29, 2016 new products announcement call, Chase also touted the
17  features and technical achievements of the Charge 2, such as its step, distance and pace tracking
18  ability. As with the Flex 2, she stated that it represented an "incredible opportunity for core and
19  category growth." During the September 7, 2016 investor presentation, Samson reiterated those
20  representations and, as stated above, added that Company's products "are already pretty accurate."

21         60.     However, on October 17, 2016, a month or so after the Company began shipping the
22  Charge 2, Fitbit admitted that the device was plagued with bugs and released a software update to
23  fix those issues. Specifically, the Company admitted that it "recently uncovered two software bugs
24  that affect specific uses of Charge 2: one related to using Connected GPS while in a few different
25  modes like walk, hike or interval modes, and the other related to using multi-sport tracking for run
26  and treadmill activities." It further admitted that, "[t]hese software errors caused the tracker to
27  occasionally calculate stats like pace and distance with less precision than we expect from our

28

products." The Company also admitted on that day that it "has performed and continues to perform internal studies to extensively test the accuracy of its products."

61.     It is therefore reasonable to infer that Defendants learned about the bugs and/or defects of the Charge 2 during the Company's extensive testing and continuous research and development on the product. As such, it was misleading for Defendants to tout the features, technical achievements and accuracy of the Charge 2 without disclosing these issues. Without a properly functional device, it was likewise unreasonable for Defendants to have stated that they would have core and category growth with the Charge 2.

### 2.     Park Falsely Reassured the Market that Analysts' Channel Checks Showing an Accumulation of Charge 2 in the Channels Were Unreliable

62.     On September 29, 2016, Pacific Crest Securities LLC analyst Brad Erickson issued a report showing that his channel checks indicated there was a "meaningful inventory accumulation in the channel" of Charge 2 devices. The firm estimated that Fitbit had likely "shipped 600,000-800,000 Charge 2 units in Q3." Based on interviews with "15 big box retailers in the United States," the report concluded there was "more than two weeks of inventory [] on hand" and that the Charge 2 was "off to a slow start."

63.     A week later, on October 6, 2016, Park gave an interview on Jim Cramer's CNBC television show, *Mad Money*, to address the reported inventory accumulation of Charge 2s and negative analyst reports in anticipation of the holiday season. This was not the first time Park went on Cramer's show. Since Fitbit became a public company, he had been on Cramer's show three times already, and each time Cramer had bullishly supported the Company to investors. It is therefore no surprise that Park chose this far-reaching medium to try to dispel the negative Pacific Crest report. And, given the long and friendly relationship between Cramer and the Company, it can be inferred that Park and Cramer discussed the Company's new products and the negative analyst reports in detail before the interview aired.

64.     Cramer asked Park about the reliability of the Pacific Crest channel checks. However, Cramer did so while also immediately questioning their validity and comparing them to channel checks that had previously been done for Apple that had been inaccurate. Park summarily

endorsed Cramer's efforts to discount the reliability of the channel checks, including by affirmatively suggesting that the reports were not credible because the Charge 2 had "just started shipping" and that the device was the "number 1 bestselling fitness tracker on Amazon." Park then went on to reassure investors that Fitbit was looking out for shareholders' best interest in the holiday season.

65.    The day after the interview, another analyst firm, Cleveland Research Company, issued a note stating its channel checks indicated new product uptake was muted and that it was concerned about the Charge 2 inventory levels.

66.    In response, *TheStreet* issued an article that same day, questioning the reliability of these channel check reports and quoting Park's interview from the day prior with *The Street*'s Jim Cramer on *Mad Money*, during which he had stated that the Company had "just started shipping the product," and that the Fitbit Charge 2 is the "number one, best-selling fitness tracker on Amazon."

67.    At the time the interview was conducted, Park knew that Charge 2 inventory levels were higher than normal in October 2016 and – despite early shipments of the product – were not selling as expected. Park had no reasonable basis for questioning the reliability of the channel checks. On the November 2, 2016 earnings call, Zerella admitted that the Q2 2016 shipments of the Charge 2 had the effect of building up inventory in Q3 2016. Moreover, during a December 6, 2016 investor presentation, he further admitted that "what we started seeing in Q3 and a continuation in October was some flattening of demand."

68.    And again Park failed to disclose during his Cramer interview the existence of defects and/or bugs with the Charge 2 and the significant risk that these issues had contributed and would continue contributing to the slowing demand and accumulated inventory of the product, despite the fact that the Company was already working on a software update to correct those issues, which was released just ten days later.

3.   **Defendants Failed to Disclose the Accumulated Inventory of the Charge 2 When It Lowered and Restated the Guidance Due to The Flex 2 Battery Issue and Some Softness in Demand and Restated the Guidance**

69.   On November 2, 2016, Fitbit held its Q3 2016 earnings call, during which the Company lowered its full-year earnings guidance from between $2.5 and $2.6 billion to between $2.320 billion and $2.345 billion and issued its Q4 2016 guidance, expecting revenue between $725 million and $750 million. During the call, Zerella said that the "shortfall" was driven by a few factors, including "some approximately $50 million of unsold demand" because Fitbit had no battery for the Flex 2 in Q3 2016.

70.   Defendants, however, did not reveal that inventories of Charge 2 were significantly higher than expected, that reorders of the product had been lower than expected, or that demand had not been in line with prior shipping commitments. Instead, Zerella stated on the call that at that time they had "adequate Charge 2 in the channel as [they] head into the holidays" and that they expect "strong sell-through from Charge 2," and Park stated that they were "seeing improvement in consumer demand in Q4."

71.   On this news, Fitbit's share price fell $4.30 per share, or 33.6%, to close at $8.51 per share on November 3, 2016, on unusually heavy trading volume.

72.   That same day, *TheStreet*, which had supported Fitbit and Park the previous month, changed their rating of Fitbit to a "Sell" with a rating score of D+ on the stock.

73.   On November 3, 2016, following Fitbit's revised guidance, Cramer stated on CNBC's *Squawk on the Street* that Park "has lost any credibility" and that "Fitbit is now done." Cramer called it "a travesty" because, when he had confronted Park a month prior on October 6, 2016 about the Pacific Crest report showing Charge 2 sales had dropped, Park "dismissed them out of hand, referring to how well his products were doing on Amazon." Moreover, on that same day, in a video posted on *TheStreet*, Cramer further described Park's recklessness as follows: "I do think he doesn't have any good financial controls in his company or he wouldn't have said that. I mean he just as easily could've said, 'look, I don't give comment,' or something like that, but no, there's no credibility there…."

74.     Analysts were likewise shocked by the Company's revised guidance and results. For example, SunTrust Robinson Humphrey issued a report on November 3, 2016, admitting that "We have been wrong on Fitbit" and "its guidance implied a sharp deceleration and raised questions around company forecasting, customer demand, and the category's maturity." Similarly, Deutsche Bank noted that "Execution continues to be poor at Fitbit measured by ability to forecast and hit key KPIs [key performance indicators]. Guidance was a significant negative in the quarter, with sales guidance of $725-$750M falling well below expectations and prior implied revenue guidance of around $985M."

75.     On November 7, 2016, Cramer stated on CNBC's *Squawk on the Street* that Park had essentially lied to him when he interviewed him on October 6, 2016:

> And, you know, I'm still struck by how Fitbit told me on October 6th to focus on Amazon as a way to figure out how they were doing. That turned out to be a complete false tell. It just didn't hold up under any close scrutiny at all. So you think "is that what they were doing?" Were they sitting there saying, "hey, wow, we're number 1 on Amazon, let's keep making the product?" Clearly there had to be other data that they were looking at, right? Right? No?

76.     On December 6, 2016, Fitbit held another investor presentation during which Zerella reaffirmed the lower guidance, stated that Fitbit was still on track to meet its lower guidance, and claimed there were still "a few more pretty big weeks" coming up to sell products.

77.     Unbeknown to investors, the Company already knew that demand for the new products had not materialized because it had not received significant reorders following Black Friday, as Park admitted on the Q4 2016 earnings call on February 22, 2017. Instead, the Company's shipments were based on non-binding "purchase commitments" made ***before*** the products began shipping based on early – and now unreliable – demand forecasts. And the commitments against which Fitbit were shipping the new products had not been in line with expected sell-throughs, as was later admitted by Zerella on the February 22, 2017 call. Even Black Friday sales had been lower than expected despite the increased promotions as the Company admitted in its January 30, 2017 press release. In fact, Park admitted on the February 22, 2017 call that they increased promotional activity because they knew demand was lagging.

78.     Defendants also knew that inventory was building up and that demand had been lower than expected in Q4 2016. Zerella admitted this on the Q4 2016 call on February 22, 2017, when he stated that Fitbit experienced "[h]igher channel inventory, coupled with weaker demand" in Q4 2016 and that "[w]ith demand less than forecast inventory built further." Defendants also knew that, as revealed by analyst Ben Bollin of Cleveland Research on January 10, 2017, inventory was so saturated that Fitbit's "[p]artners had to completely stop production for Fitbit because they are swimming in product" and that demand was so weak that there were "some concerns partners may not get paid for all of the product they have built."

79.     Therefore, Defendants had no reasonable basis to reaffirm the lower guidance and to state that Fitbit was still on track to meet its guidance because they admittedly knew by then that the Black Friday product reorders had not occurred and been lower than expected, that prior shipping against commitments had not been in line with expected sell-throughs, that inventory levels were higher than expected, and that demand for its products had slumped.

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE WITH SCIENTER DURING THE CLASS PERIOD

80.     During the Class Period, Fitbit, Park and Zerella, acting with scienter, each made, authorized, or had ultimate authority over statements that were materially false and misleading to investors or omitted material facts necessary to make them not misleading under the circumstances. These included, as further described below, misrepresentations and/or omissions pertaining to Fitbit's (i) revenue guidance and margin growth, and (ii) the features, technical abilities, market opportunities and/or inventory levels of Fitbit's new products, the Flex 2 and the Charge 2. As alleged herein:

(a)     Defendants lacked a reasonable basis for supporting an expectation that the Flex 2 would be shipped on time and in sufficient quantities to meet the demand on which the revenue guidance was based, because they failed to disclose that the Company had not yet sourced a small enough battery for the device.

(b)     It was misleading for Defendants to tout and/or reaffirm the features, technical abilities and market opportunities of the Flex 2 and the Charge 2 because they failed to

disclose that they had not sourced a small enough battery for the Flex 2's waterproof feature that would render it functional and that they had internally uncovered defects and/or bugs that rendered the Charge 2 unreliable.

(c)     Defendants' statements regarding margin growth were false and/or misleading because they failed to disclose or account for the fact that Fitbit was experiencing excess waste and scrap costs and incurring additional manufacturing costs in producing the Flex 2.

(d)     Defendants falsely reassured investors that the analysts' channel checks showing an accumulation of Charge 2 in the channels after the product had shipped were unreliable and failed to disclose that sales had been impacted by the bugs and/or defects they had internally uncovered that were affecting the reliability of the device's features.

(e)     It was misleading for Defendants to have reaffirmed the lower guidance in December 2016 without disclosing that the reorders that occurred following Black Friday had been lower than expected, that shipments against commitments up to and including Black Friday had not been reflective of actual demand, and that inventory had accumulated.

### A.     Q216 Earnings Announcements (August 2, 2016)

#### 1.     False and/or Misleading Statement Regarding Revenue and Margin Growth

81.     On August 2, 2016 (a month into Q3 2016), Fitbit filed a report on Form 8-K and issued a press release entitled "Fitbit Reports $587M Q216 Revenue, $0.03 GAAP EPS/$0.12 Non-GAAP EPS, and Confirms Revenue and Profit Guidance for FY16." In its press release and 8-K, the Company provided the following earnings guidance for the remainder of the year:

> Fitbit's outlook for the full year of 2016 is as follows: Revenue in the range of $2.5 to $2.6 billion [and] Non-GAAP gross margin of approximately 47%[.]

82.     On the same day, August 2, 2016, Fitbit held its Q2 2016 earnings call. Park, Zerella and Brad Samson attended and participated in the call. Numerous investors and market analysts also listened to or participated in the call, including representatives of Raymond James & Associates, Inc., Citi, Morgan Stanley, BofA Merrill Lynch, Longbow Research, Mizuho Securities USA, SunTrust Robinson Humphrey, Deutsche Bank, Piper Jaffray & Company, Dougherty & Company,

Stifel and Leerink Partners. The information communicated during the call was the subject of research reports and commentary by these and other market observers, and was widely disseminated by the financial press and other media outlets, such that the information became incorporated into and affected the market price for Fitbit's publicly-traded securities.

83.    On the call, Zerella reiterated and further explained the Company's guidance for second half 2016 revenues and earnings:

> Moving to the full year, we are maintaining our full-year revenue and EPS guidance ranges of $2.5 billion to $2.6 billion and $1.12 to $1.24 in diluted earnings per share. While our expectations for gross margin for the second half 2016 remain unchanged from our previous views, the full-year gross margin will be impacted by the Q2 2016 actual results. Our full-year adjusted EBITDA guidance also remains unchanged at $430 million to $490 million.

84.    Zerella also stated on the call that the margin trends on the new products were strong:

> I should also note that we are seeing strong margin trends on our new products which are also benefiting from lower warranty costs due to their inherent design and the improved manufacturing processes we have implemented this year. We expect this trend to also apply to other new products we will be introducing heading into the holidays, driving our gross margin trends in the second half 2016.

85.    By virtue of the facts alleged in § IV.C.1., and the other facts set forth herein, the Company's earnings and margin growth guidance were materially false and/or misleading when provided to investors because they failed to disclose and misrepresented the Flex 2 battery shortage, increased manufacturing costs, and delayed shipments. In particular, and as alleged in more detail above:

(a)    The guidance provided to investors was false and/or misleading when issued because Defendants failed to disclose it was based, in part, on sales of Flex 2 that were at risk of not being materialized because Fitbit did not yet have a battery for the Flex 2. As Park and Zerella admitted on the Q3 2016 earnings call on November 2, 2016, poor sales of the Flex 2 were the result of the failure to locate a battery for the product, which prevented the product from being shipped in Q3 or being manufactured in sufficient quantities to replenish inventories to meet market demand or support the Company's forecast guidance.

(b)    The guidance provided to investors was false and/or misleading when issued because Defendants failed to disclose that without a battery for the Flex 2 in Q3 2016, there was a

significant risk that Defendants would not be able to ship the product on time, which created further significant and known risks to the achievement of that guidance. The guidance provided to investors was based in part on the expectation that Flex 2 would be shipped during Q3 2016 and would be manufactured in sufficient quantities to meet the anticipated demand on which the guidance was based. However, Flex 2 shipments did not begin until early October 2016, and Fitbit blamed the lack of a small enough battery for not being able to ship the Flex 2 on time. As Zerella admitted on the Q3 2016 earnings call on November 2, 2016, "[b]asically, what happened at the end of Q3 was channel inventories went down in Flex, and we weren't able to replenish at the level we anticipated in terms of Flex 2 . . . ."

(c)      The guidance was false and/or misleading when made because Defendants failed to disclose the increased Flex 2 manufacturing costs the Company was incurring at the time. As Zerella admitted on the Q3 2016 earnings call on November 2, 2016, the Company had incurred increased production costs in Q3 2016: "Flex 2 production challenges result in higher than expected waste and increased scrap costs, which will continue to influence Q4" and "In Q3 . . . it was basically the reason why we were at -- the scrap charges we took in Q3 was the reason why we ended up at the bottom end of the range on gross margins versus the midpoint or towards the high end."

86.      By virtue of the facts alleged in § IV.C.1. and the other facts set forth below, it may be strongly inferred that Defendants knew or recklessly disregarded that the revenue and margin guidance were false and/or misleading when made because they knew that Fitbit did not have a battery for its Flex 2, that the Company was incurring increased manufacturing costs in producing the Flex 2, and that there was a significant risk that they would experience shipment delays and supply constraints of the Flex 2, which would result in unfulfilled demand, the concession of sales and market share to competitors, lower margins and lower revenue:

(a)      Defendants knew or recklessly disregarded, at the time the above statements were made, that the Company had not yet sourced a battery for the Flex 2, and also knew or recklessly disregarded that finding such a battery would be difficult due to the small size required

and the need to waterproof the product. Since production for the Flex 2 was already underway by August 2, 2016, the lack of a battery was known to Defendants at the time the foregoing statements were made. For example, on the August 29, 2016 call, Zerella stated that Fitbit was preparing to "ship these two new products [Flex 2 and Charge 2] [during the] latter part of the quarter." Scienter is further supported by the "long lead times in the supply of these components," as described in ¶¶ 41, 87, and the fact that early production prototypes had been provided to some retailers under a Non-Disclosure Agreement by the time of the call. Yet, as Park admitted on the November 2, 2016 call, "[i]t was incredibly difficult to find batteries that were small enough to fit in the device" and that "it was small enough that we actually had to move to a fully automated production process using robotics to manufacture that product" "[so] there was a lot of things that we had to invent and learn along the way, resulting in you could say a non-optimal initial production process." Thus, Defendants knew at the time the foregoing statements were made that they lacked a battery for the Flex 2 and that the guidance was misleading because it failed to disclose this issue.

(b) Defendants knew or recklessly disregarded, at the time the above statements were made, that because of the production issues, there was a significant risk that the Flex 2 could not be shipped in the third quarter and that there would be supply constraints of Flex 2 during the holiday season which would result in unfulfilled demand, the concession of sales and market share to competitors, and lower revenue.

(c) Defendants knew or recklessly disregarded, at the time the above statements were made, that the guidance they provided to investors was, and would be, misleading to investors in the absence of disclosure of the fact that a source for a critical component of the Flex 2 had not been located and the guidance was contingent on the Company's ability to do so quickly in order to meet the aggressive manufacturing and shipping schedule on which its guidance was based.

(d) Defendants knew or recklessly disregarded, at the time the above statements were made, that their expectations for improved margins on the Flex 2 were misleading because the Company had incurred and was incurring increased manufacturing costs for the Flex 2 in Q3 2016. As Zerella admitted on the Q3 2016 earnings call on November 2, 2016, "Flex 2 production

challenges result in higher than expected waste and increased scrap cost, which will continue to influence Q4" and "In Q3 . . . it was basically the reason why we were at -- the scrap charges we took in Q3 was the reason why we ended up at the bottom end of the range on gross margins versus the midpoint or towards the high end." Given that Fitbit was ramping production of the Flex 2 at the time of the call and that production prototypes had already been provided to customers, as alleged above, the increased waste and scrap costs had already begun to be incurred and were known to or recklessly disregarded by Defendants at the time of the call when they made the above statements regarding margin growth.

(e)     Defendants knew or recklessly disregarded that, as the Company's risk warnings state in its Q2 2016 Form 10-Q, "the success" of the Flex 2 depended on the "effective management of manufacturing and supply costs" of this new product. Therefore, given the importance of the Flex 2 to the Company's financial results and guidance, Defendants knew or recklessly disregarded that the Flex 2 production issues and higher costs was impacting the success of the product on which the revenue guidance and margin growth was based.

### 2.     Fitbit's Boilerplate Risk Disclosures Were Materially Misleading

87.     On August 4, 2016, Fitbit filed its Q2 2016 Form 10-Q with the SEC. The report was signed by Park and Zerella. It contained the following risk disclosures (emphasis in original):

> ***Because many of the key components in our products come from limited or sole sources of supply, we are susceptible to supply shortages, long lead times for components, and supply changes, any of which could disrupt our supply chain***.
>
> Many of the key components used to manufacture our products come from limited or sole sources of supply. Our contract manufacturers generally purchase these components on our behalf, subject to certain approved supplier lists. We are therefore subject to the risk of shortages and long lead times in the supply of these components and the risk that our suppliers discontinue or modify components used in our products. In addition, the lead times associated with certain components are lengthy and preclude rapid changes in quantities and delivery schedules. We have in the past experienced and may in the future experience component shortages, and the predictability of the availability of these components may be limited. While component shortages have historically been immaterial, they could be material in the future. In the event of a component shortage or supply interruption from suppliers of these components, we may not be able to develop alternate sources in a timely manner. In addition, some of our suppliers, contract manufacturers, and logistics providers may have more established relationships with our competitors, and as a result of such relationships, such suppliers may choose to limit or terminate their relationship with us. Developing alternate sources of supply for these components

may be time-consuming, difficult, and costly and we may not be able to source these components on terms that are acceptable to us, or at all, which may undermine our ability to meet our requirements or to fill our orders in a timely manner. Any interruption or delay in the supply of any of these parts or components, or the inability to obtain these parts or components from alternate sources at acceptable prices and within a reasonable amount of time, would harm our ability to meet our scheduled product deliveries to our customers and users. This could harm our relationships with our channel partners and users and could cause delays in shipment of our products and adversely affect our operating results. In addition, increased component costs could result in lower gross margins. If we are unable to buy these components in quantities sufficient to meet our requirements on a timely basis, we will not be able to deliver products and services to our customers and users."

88.     The foregoing risk disclosure was materially false and misleading because it purported to warn of the impact of *potential* parts shortages, reliance on third parties to buy key components, and long lead times for components without disclosing that those risks had *already* manifested with respect to a key component of one of its new products – the Flex 2 battery.

89.     As alleged in § IV.C.1., by August 4, 2016 – when the 10-Q was issued – Defendants knew or recklessly disregarded that they lacked a source for a battery for the Flex 2, and thus knew that this lack of batteries had delayed production for the product and increased the risk that the product could not be manufactured in sufficient quantities in advance of the holiday shopping season to meet anticipated demand for the product. Therefore, Defendants knew or recklessly disregarded that the Company's risk disclosure was misleading in that it failed to disclose that the Company had not found a battery for one of its two key products for the holiday season.

**B.     New Product Launch Announcement (August 29, 2016)**

**1.     False and or Misleading Statements Reaffirming the Guidance and the Shipment Date of the Flex 2**

90.     On August 29, 2016 – almost two months into Q3 2016 – Fitbit hosted a New Product Overview Conference Call and Webcast. Zerella, along with Samson and Chase attended and participated in the call. The information communicated during the call was the subject of research reports and commentary by these and other market observers, and it was widely disseminated by the financial press and other media outlets, such that the information became incorporated into and affected the market price for Fitbit's publicly-traded securities.

91.     During the call, Zerella reaffirmed the August 2, 2016 guidance and said that the Company was still on track to ship both of its new products in Q3 2016. For example, when analyst

Jim Duffy (Stifel) asked whether "the current anticipated timing for the product launches [was] consistent with views that shaped the Q3/Q4 guidance," Zerella replied, "the answer is yes."

92.     During the same call, Zerella again reaffirmed the Company's guidance in response to questions about the level of channel inventory of Fitbit's products:

> So, the winding down in the channel of Charge HR and Flex, and then starting to ship these two new products latter part of the quarter, is consistent with what we described on our Q2 earnings call. There is no update to our guidance discussion -- or our guidance, rather, on this call. So, everything is consistent with what we talked about on the last earnings call.

93.     Later in the call, another analyst asked Zerella: "[H]ow [do] the new product launches affect margins? How do they compare to past launches? Are they coming out of the gate closer to target?" Zerella again responded by reaffirming the Company's guidance:

> Yes. So, again, we are not providing any update to guidance. And our guidance certainly incorporated these products since they've been on the roadmap and these are being released as previously planned.

94.     By virtue of the facts alleged in § IV.C.1., and the other facts set forth herein, Zerella's statements reaffirming and asserting that the Company was on track with its August 2, 2016 guidance were false and/or misleading because the Company had still not located a small enough battery for the Flex 2 as of August 29, 2016, it was not on track to ship the product on time and in sufficient quantities to meet the demand on which the guidance was based. Further, these statements were also false and/or misleading because the Company was incurring additional production costs that impacted margins.

95.     By virtue of the facts alleged in § IV.C.1. and the other facts set forth below, it may be strongly inferred that at the time Zerella made those statements, Defendants knew or recklessly disregarded that the Company was not on track to meet its guidance:

(a)     Defendants knew as of August 29, 2016 that Fitbit did not have battery for the Flex 2 even though the product was supposed to ship in less than a month. As Park admitted on the Q3 2016 earnings call on November 2, 2016, the reason the Flex 2 could not be shipped on time was because they could not find a battery for it in Q3 2016. Defendants have thus admitted that they knew they had no battery for the Flex 2 in Q3 2016.

(b)     Defendants knew as of August 29, 2016 that they would not be able to ship the Flex 2 by the end of Q3 2016 given the lack of battery, the long lead times for sourcing components, and the fact that the Company was relying on a single contract original equipment manufacturer and a limited number of third-party suppliers.

(c)     Defendants knew as of August 29, 2016 that due to the delays and supply constraints, they would not be able to meet the demand on which the guidance was based;

(d)     Defendants knew as of August 29, 2016 that the Company was not on track to meet its margin guidance because, as Park admitted, Fitbit was incurring increased waste and scrap costs in producing the Flex 2 that were impacting the third quarter margins.

96.     By virtue of the facts alleged in § IV.C.1., and the other facts set forth herein, Zerella's statements reaffirming and asserting that the Flex 2 would start shipping in the "latter part of the quarter" "as previously planned" "consistent with views that shaped the Q3/Q4 guidance" were false and/or misleading because as of August 29, 2016, the Company had still not located a small enough battery to meet its end-of-September shipment deadline.

97.     By virtue of the facts alleged in § IV.C.1. and the other facts set forth below, it may be strongly inferred that at the time Zerella made those statements, Defendants knew or recklessly disregarded that the Company was not on track to ship the Flex 2 by the end of the quarter as expected since Fitbit did not have a battery for the Flex 2 yet. Therefore, given that the scheduled shipment date was only a month away, that there was a long lead time to source components and that they relied on a single contract original equipment manufacturer and a limited number of third-party suppliers, Defendants knew they would not be able to ship the product on time.

### 2.     False and/or Misleading Statements Regarding Flex 2 Product Features and Competitive Strength

98.     During the August 29, 2016 new product conference call, Melanie Chase introduced Fitbit's new and upcoming products, the Flex 2 and Charge 2. She touted the features, technical achievements and market opportunities of the Flex 2, such as its "slimmer swim-proof design," "versatility," "new [] partners," "swim-proof" feature ("water resistant up to 50 meters or 150 feet"), and "five days of battery life." The Flex 2 represented a purported "large core and category growth

opportunity" for Fitbit because it would be marketed to two entirely new categories of users, women and swimmers.

99.     Fitbit said it had designed the Flex 2 to be slim so it could be worn as jewelry, thereby appealing to users beyond fitness buffs, such as women who were not attracted to the existing product line because they did not want to look like they were wearing technology. As Fitbit's first "swim-proof" fitness tracker, the Flex 2 was also designed to appeal to swimmers, another previously untapped pool of potential users. In introducing the Flex 2, throughout these presentations, Chase touted the features of the Flex 2 that could make the device attractive to new user demographics without ever disclosing that the Company had not found or procured a battery that was small enough to make these features work.

100.     For example, during this presentation, Chase stated:

> When Flex launched back in 2013, it was truly a breakthrough product in the wrist-based wearables category. It was designed with style and versatility in mind, and our consumers loved that it was slim and simple and easy to use. And, in fact, it was the number one selling fitness tracker in the US from 2013 to 2014 when Charge HR came into the market.

> That brings us to Flex 2. It's our iconic fitness wristband reimagined with a slimmer swim-proof design, increased versatility for wear from day to night, and new exercise and smart features that blend fun and fitness.

> In terms of features, it has all the things that you know about Fitbit; it tracks all the activities, steps, distance, calories burned, active minutes. It automatically tracks your sleep and wakes you with a silent vibrating alarm. ***And it has up to five days of battery life***.

> But we have taken all of that and we have added twice as many features in something that is even smaller. What's new? Well, it has a slimmer design. It is designed for versatility. It has new (technical difficulty) partners. It's swim-proof, and it has swim tracking. It has automatic exercise recognition, reminders to move, and call and text notification.

> Here in this image you can see that Flex 2 is 30% smaller than Flex today. And all of that -- by slimming it down, it makes it something that is very wearable, very comfortable, whether you want to track discreetly or show it off. It's something you can wear next to a watch or on its own.

> And the real innovation comes here. This is a picture of the removable tracker that goes inside the band. And you can see it is only slightly larger than an almond. This is real innovation for us. It became -- ***we were able to shrink down the size through a ton of R&D research, component sourcing***, and miniaturization, which allows us to make a tracker that can hide away discreetly in jewelry and wristbands and other accessories.

101.   Chase continued her presentation by touting the untapped market potential that could be reached by the Flex 2:

> You can see this is a big step forward in making tracking technology really look like jewelry. And when we were designing this project -- this product, we talked to many consumers -- a lot of them women -- who had not yet tried fitness tracking. They were interested in it, but they told us, "I don't always want to look like I'm wearing technology." This is a product that reaches out to those new users and brings them into the category with something that can look however they want it to.

> The other big innovation here is this is our first swim-proof tracker. It's water-resistant up to 50 meters or 150 feet, which is deeper than most people will ever go scuba diving. It also tracks swimming and counts laps automatically. And it's life-proof, so you can wear it in the shower, you can wear it when you are giving your kids a bath or washing the car, and never have to worry about it.

*       *       *

> ***So, again, with Flex 2, we believe there is a large core and category growth opportunity***. It's at a very entry-level price point of $99.95; it's been very powerful for us in the past. It's very giftable, and it is easy for someone who hasn't tried the category out yet to commit to.

> It's also for everyone. It's very easy and simple to use. So, for some consumers who are less familiar with technology, this is something that they can feel comfortable trying out. It's also intended to bring new users into the category. We talked a little bit about bringing users into the category who didn't necessarily want to look like they were wearing technology on their wrist, but it also brings swimmers into our brand.

102.   Later in the call, when asked to discuss "the challenges in making a waterproof Flex," Chase acknowledged that the product had seemed "a little bit more difficult to waterproof," but did not reveal that the challenges in doing so had ***not*** been overcome as of the time of the presentation, as demonstrated by the lack of a battery small enough to permit the tracker to be waterproofed.

103.   By virtue of the facts alleged in § IV.C.2., and the other facts set forth herein, Chase's statements regarding the features, core and category growth opportunities, and technical achievements of the Flex 2 were materially false and/or misleading when provided to investors because they failed to disclose and misrepresented that Defendants did not have a battery for the product at the time and that there was a significant risk shipments would be delayed and supply would be limited, which would impact the sales of the product and the ability of the Company to attract new categories of users. And Chase's statements that it was "a little bit more difficult to

waterproof" the Flex 2 and that Fitbit was able to "shrink down the size" of the Flex 2 "through a ton of […] component sourcing" were false and/or misleading given that no battery small enough for the waterproof feature had been sourced yet. As a William Blair analyst noted on November 3, 2016, "[t]he production issues stemmed from the product's 'incredibly small form factor' and challenges sourcing batteries for its swim-proof feature."

104.    By virtue of the facts alleged in § IV.C.2. and the other facts set forth below, it may be strongly inferred that Defendants knew or recklessly disregarded that it was misleading to tout the features, core and category growth opportunities, and technical achievements of the Flex 2:

(a)    Defendants knew or recklessly disregarded that the Flex 2 did not have a battery at the time to render the device functional. At the time Chase made the above statements, production was ramping up to ship the product by the end of the quarter and as Defendants admitted on the Q3 2016 earnings call on November 2, 2016, shipments were delayed due to the lack of battery in Q3 2016. Defendants have thus admitted they did not have a battery by August 29, 2016. Yet, the waterproof feature, the five days of battery life, the slimness of the product and its appeal to the new categories of users, all required that the product had a small enough battery to fit its size. Without a battery, Defendants knew or recklessly disregarded that the Flex 2 was not functional, that its touted features and technical abilities were useless, and that it could not reach new categories of users.

(b)    As of August 29, 2016, Defendants also knew or recklessly disregarded that due to the lack of battery and difficulty in sourcing one, Fitbit would likely not be able to ship the product in sufficient quantities to meet demand and capture the new categories of users they aimed to reach. Defendants admitted on the Q3 2016 earnings call on November 2, 2016 that the Flex 2 supply constraints were due to the lack of battery. Therefore, it is reasonable to assume that as of August 29, 2016, they knew or recklessly disregarded that without a battery, they would experience supply constraints that would hamper their core category growth opportunity because they could not reach those users without adequate supply of the product.

105.    It was also misleading for Defendants to state that it was "a little bit more difficult to waterproof" the Flex 2 and that Fitbit was able to "shrink down the size" of the Flex 2 "through a ton of […] component sourcing," given that as explained in ¶ 58, they had yet not sourced a small enough battery for the waterproof feature.

106.    As of August 29, 2016, Defendants knew or recklessly disregarded that it was incredibly difficult to waterproof the Flex 2 and that they had not been able to shrink down its size through components sourcing since a small enough battery was missing. On the November 2, 2016, Park admitted that the "small form factor made it incredibly difficult to swim-proof the device" and that it was "incredibly difficult to find batteries that were small enough to fit in the device." Therefore, Defendants have admitted that they knew on August 29, 2016, when they were ramping production of the device to try to ship by the end of Q3, that it was "incredibly difficult" to waterproof the device and that they had not been able to "shrink down the size" of the Flex 2 through "component sourcing."

### 3. False and/or Misleading Statements Regarding the Charge 2 Quality Control Issues

107.    On the August 29, 2016 call, Chase also touted the features, technical achievements and category growth opportunities of Fitbit's other new and upcoming flagship product for the holidays, the Charge 2. Specifically, Chase stated that the Charge 2 – which replaced the Charge HR – had "smarter technology" than the earlier version, including "all-day activity tracking" and "steps and distance tracking."

108.    For example, during the call, Chase introduced the product as follows:

When we launched Charge HR, it was a groundbreaking product within the category. It was the first to introduce continuous and automatic heart rate to your wrist all day during workouts while you're sleeping, with up to five days of battery life.

These were features that consumers found incredibly usable and incredibly useful. And when designing Charge 2, we wanted to give people what they loved about Charge HR and make it even better. ***So, introducing our most popular fitness wristband reimagined with more heart rate innovation, more personal style, and smarter technology, to help you make every beat count.***

Quick overview of the features here. ***Charge 2 has everything that consumers have grown to love about Fitbit. It has all-day activity tracking,*** heart rate tracking from PurePulse technology, SmartTrack automatic exercise recognition, auto sleep

tracking, and a long battery life of up to five days. But it does so much more than that.

109.     Chase then went on to further tout the features of the Charge 2 without disclosing the known bugs and/or defects that rendered those features unusable:

> **We have added multisport tracking to the products, so you can track things like bike rides, weightlifting, yoga, hiking, and see just the steps that matter on display, and then get an exercise summary after your workout, on the app.** Here you can see an exercise summary which shows your time and heart rate zone during your workout.
>
> We've also added connected GPS, which means that you can connect to the GPS on your smartphone. **And when you run with your phone, you can see it live, running, and pace stat, like pace and distance**; and then after your run, you can see a route of your map on the app. So with something like this, we've taken a feature that usually comes in a larger GPS watch and put it into a very small risk-based form factor.
>
> *          *          *
>
> So this is just another way that we can build off of our great sense of technology (technical difficulty) that's been featured on the device that people need and can use in their daily life.
>
> *          *          *
>
> **So, in summary, we believe Charge 2 has an incredible opportunity for core and category growth. In terms of demand, we are upgrading the number one selling activity tracker in the US, so we know there is a place for this. It also has essential features -- combining heart rate, fitness tracking, all-day activity, and smart features, and what we have found to be a very approachable price point at $149.95.**

110.     By virtue of the facts alleged in § IV.D.1., and the other facts set forth herein, the statements regarding the features, technical achievements and core and category growth opportunities of the Charge 2 were materially false and/or misleading when provided to investors because they failed to disclose and misrepresented the quality control issues that plagued the Charge 2, resulting in inaccurate stats such as pace and distance tracking.

111.     By virtue of the facts alleged in § IV.D.1. and the other facts set forth below, it may be strongly inferred that at the time Defendants touted the features, technical achievements and core and category growth opportunities of the Charge 2, they knew or recklessly disregarded that it was plagued with bugs and/or defects:

(a)        The pace, steps and distance tracking features, and its appeal to the new categories of users, all depended on the expectation that the product was functional. Defendants knew that, as stated in the Q2 2016 Form 10-Q, the "success" of the product depended on its "defects or qualities."

(b)        Defendants knew by August 29, 2016 that the Charge 2 was plagued with bugs and/or defects because on October 17, 2016, a month after the product began shipping in mid-September 2016, Fitbit admitted that there were software bugs in the device that had resulted in inaccurate stats such as pace and distance tracking and issued a software update to try to fix these issues. Given that Fitbit acknowledged they "performed and continue[d] to perform internal studies to extensively test the accuracy of" the Charge 2, it is reasonable to infer that they found out about those bugs and/or product defects during testing and research and development by August 29, 2016.

**C.        September 2016 Roadshows**

112.    As alleged above, on August 29, 2016, Chase had touted the features, technical abilities and market opportunities of the Flex 2 and Charge 2 to the market. Regarding the Charge 2, she had stated that it had "more heart rate innovation" and "smarter technology" that included "all-day activity tracking," "heart-rate tracking," "steps and distance tracking" and "a long battery life of up to five days" and that it represented "an incredible opportunity for core and category growth."

113.    Following the new products announcement on August 29, 2016, Samson gave at least three presentations at investor conferences in New York City to further tout the Company's two new products, the Flex 2 and the Charge 2. On September 7, 2016, Fitbit held an investor presentation at the Citi Global Technologies Conference, in which a Citi representative participated. On September 8, 2016, Fitbit held an investor presentation at the Robert W Baird Global Healthcare Conference, in which a Robert W Baird representative participated. On September 14, 2016, Fitbit held an investor presentation at the Deutsche Bank Technology Conference, in which a Deutsche Bank representative participated. The three presentations were later opened up to audience members for questions. As reflected in transcripts made publically available to analysts and investors, Samson

made essentially the same canned presentation at each of these conferences, thus reflecting that the presentations had likely been prepared in advance and approved by the Company.

114.    During the September 7, 2016 presentation, the following exchange took place, during which Samson claimed that Fitbit was still on track to meet its predicted growth for the year and reaffirmed the statements made during the August 29, 2016 presentation about the features, technical abilities and market opportunities of the Charge 2 and Flex 2:

ANALYST:    Let's kick it off with just an update on the new products. You had the webcasts. What's been the early feedback? Anything you can give us in terms of indications of, I don't know if it's too early for pre-order indications but you did that last time with Blaze and Alta. You guys talked about that. So maybe you can just sort of give us the early feedback that -- on the new products and how you feel about the second half of the year here.

SAMSON:    Sure. And I've got one with me, if anybody wants to see it afterwards. This is the new Charge 2. It's quite a nice, sleek device. I think we should do very, very well with it, frankly. I haven't seen any of the new pre-order data. It's only been a week since we did the announcement. *I hope some of you were actually able to tune into the webcast we did last week announcing the new products*. If you missed it, we have both the slides and the videos available on our website in the Investor Relations section. If you didn't see it, we announced two new products last Monday in time here for the holidays. One is a replacement for the original Charge HR. And that's the Charge 2 with the new format we have with the replaceable bands and ability to upgrade to leather and metal and other kinds of nice bands. And the other product is the Flex 2 which replaces the Flex product we had previously. *It's our first fully waterproof product, swim-proof*. It's -- they're both represent nice upgrades in terms of the capabilities that the products have at these price points. And we think that at these respective price points, part of our strategy is to continue to have a feature and value bundle that consumers find the most compelling of what anybody else is offering in these price points. So we're very optimistic. We think with essentially four new products going into the holiday season this year as well as the number of accessories. . . . But we've got a tremendous opportunity here at Christmas this year. I think all the indicators are that -- *we've guided to a very robust Christmas this year with a nice increase year-over-year in unit volume. And so we're very optimistic looking forward.*

115.    During the September 8, 2016 presentation, which occurred one day after Apple's announcement of the new Apple Watch Series 2, the following exchange took place during which Samson again stated that the Company was on track to meet its predicted growth for the year and downplayed competitive pressures in the market, including those arising from Apple's

announcement. Samson assured investors that the Company did not directly compete with smart watches and then touted its ability to compete based on the purported technical superiority of its products, including battery life:

> ANALYST:   [T]here is a new product out there from Apple. They've got a partnership with Nike. To the extent that you can, and I know we want to talk more about Fitbit than we do about anyone else, but to the extent that you can, can you maybe frame how you guys view the competitive environment? It's evolving, and like I said at the outset you guys have done a really great job maintaining your share by most of the share metrics that Baird has and others but I'd love to know how you think about it going forward, into what obviously for you guys will be a particularly important Q3, Q4 period because your numbers are so back-half loaded.

> SAMSON:   Yes, let me immediately dispel the biggest issue. I do get asked the question that's like, okay, so was yesterday really bad for you? . . . ***Fitbit has two big advantages against several of the players we're talking about in the marketplace, one of which is battery life***. And all of the products in our product lineup are basically four or five days of battery life even on the most sophisticated product. That has been one of the bugaboos of at least the prior-generation Apple Watch. I don't know what the new gen 2 is going to really do. But I will tell you when you add a GPS chipset into something, as we have in our Surge product, GPS consumes a lot of power and it will be interesting to see what really happens with their new device in terms of actual power management. Third-party apps are also a major memory and battery drain, as well, and that's one of the reasons why so far we have not had that.

116.   Samson then again reaffirmed the Company's guidance, and again said nothing had changed, and maintained the Company was on track to hit revenue in the range of $2.5 to $2.6 billion:

> We've got four new products this year going into the holidays this year. ***I think we expect to have -- our guidance shows a very good holiday season this year. I don't think anything that's happened recently competitively changes any of that dynamic in any way***. I think consumers are very excited about the new products that were just announced last week. They certainly have been responding incredibly well to the new products launched earlier in the year, the Alta and the Blaze. The Blaze has done better than I think many, many people thought it possibly could.

117.   During the September 14, 2016, presentation, Samson again touted the battery of the Flex 2 as having more days of battery life than the Apple Watch:

> ***But there are some major differences between their products and ours. One of the big differentiators we have, for example, at Fitbit is every one of our devices from the simplest and the most complex has at least four or five days of battery life. And that's a huge differentiator for us compared to the Apple Watch even with the***

*newer ones with the improved battery life*. It was interesting to see them add a GPS chip set, for example. I can tell you as somebody who's worn a Fitbit Surge for a year and half now, GPS chip sets do a really good job of chewing through battery life. And so there's some real puts and takes there. So we have most of our users like to track their sleep. They like to wear their device at night. And so our extended battery life is really an important purchase characteristic for them.

118.   Samson also touted the accuracy of its new products:

*Yes, first of all, I think our products are already pretty accurate. We spent three years of R&D and testing before we actually brought them to market, so we're pretty confident in them, lawsuits notwithstanding, and that limits some of what we can say.*

119.   Samson's statements representing that the Company was on track to meet its predicted growth for the year and reaffirming the features, technical abilities and market opportunities of the Flex 2 and Charge 2 were false and/or misleading because he failed to disclose that the Flex 2 lacked a battery, that there was a significant risk its shipment would be delayed and supply limited which would impact the Company's guidance and ability to reach new categories of users, and that the Charge 2 had many quality control issues which affected its reliability and would impact expected sales on which the guidance was based.

120.   By virtue of the facts alleged in §§ IV.C., IV.D.1. and the other facts set forth below, it may be strongly inferred that Defendants knew or recklessly disregarded that it was misleading to state that the Company was on track to meet its predicted growth and to tout the Flex 2 and Charge 2 features, accuracy, technical abilities and market opportunities:

(a)   By September 7, 8 and 14 2016, Defendants knew or recklessly disregarded they did not have a battery for the Flex 2. Production was ramping up in early September to meet the end-of-the-quarter shipment deadline and, as Park admitted on the Q3 2016 earnings call on November 2, 2016, no reliable source for a battery for the product had been identified in that quarter and finding a small enough battery "was incredibly difficult."

(b)   By September 7, 8 and 14 2016, Defendants knew or recklessly disregarded that the Flex 2 would not ship as expected and in sufficient quantities given that they still had not found a battery for it. Therefore, Defendants knew that there was a significant risk they would not be able to meet the demand their revenue guidance was based on and to reach new categories of users without adequate supply of the Flex 2 in the channels.

(c)     By September 7, 8 and 14 2016, Defendants knew or recklessly disregarded they were incurring additional manufacturing costs in connection with the Flex 2, as Park so admitted on the Q3 2016 earnings call on November 2, 2016, which was impacting the Company's margins.

(d)     By September 7, 8 and 14 2016, Defendants knew or recklessly disregarded that the Charge 2 had quality control issues that rendered it unreliable and inaccurate. As further detailed in ¶ 60, the Company issued a software update on October 17, 2016 – a month or so after those statements were made the Charge 2 was released – to try to fix the inaccurate calculation of some of its stats such as the distance and pace tracking. The Company also admitted on that day that it "has performed and continues to perform internal studies to extensively test the accuracy of" its products. Given that Fitbit performs "continuous" testing and research and development and did "three years of R&D and testing before [it] actually brought [the new products] to market," it is therefore reasonable to infer that Defendants knew about these quality control issues at the time these statements were made. Therefore, not only was it misleading for Defendants to tout the attributes of the Charge 2 while knowing about the defect and/or bugs plaguing the device, such as inaccurate stats, but it was misleading to reaffirm the guidance without disclosing these issues.

**D.     Park's *Mad Money* Interview (October 6, 2016)**

121.   On September 28, 2016, Pacific Crest analyst Brad Erickson, issued a note cutting its rating on Fitbit shares to Underweight from Sector Weight, after his channel checks showed that the Fitbit's Charge 2, which had started shipping mid-September 2016, had too much accumulated inventory. After speaking with "15 big box retailers in the United States," Erickson pointed to a "meaningful inventory accumulation in the channel" with "more than two weeks of inventory [] on hand" and a rate of sell-through below initial levels for Fitbit's Blaze and Alta fitness bands. The Pacific Crest report concluded that the Charge 2 was "off to a slow start" and estimated that Fitbit had likely "shipped 600,000-800,000 Charge 2 units in Q3."

122.   On October 6, 2016, given investor concerns, Park went back on Cramer's *Mad Money* for at least the fourth time in Fitbit's first 18 months as a public company to address the

Pacific Crest report and the reported inventory accumulation of Charge 2s in anticipation of the holiday season. Airing daily on CNBC at 6 p.m. EST for over ten years, *Mad Money* provided Park with a platform to get his message across. Its episodes are also uploaded daily on the cable channel's website.[4]

123.   During the October 6, 2016 interview, the following exchange took place in which Park worked with and used Cramer to discredit the notion that inventory of Fitbit products was building beyond demand, by tacitly endorsing Cramer's dismissal of the reliability of the channel checks and affirmatively suggesting that Pacific Crest was not credible because the Charge 2 had just begun shipping:

Cramer:   Alright now, there are still stories – I mean for instance the other day your stock was starting to move up and then suddenly Pacific Crest comes out with a piece which says they've done some channel checks and they say that your new Fitbit has got too much inventory. I mean I have become very chagrin, if not questionable, about channel checks just -- when Apple was at 93, the channel checks said that the [iPhone] 7 wasn't going to work, [that] 7, I think, is in short supply. Can I trust channel checks versus what ultimately the results will be?

Park:   You know, without knowing how that analyst did the channel checks I can't really say, but what I can say is: Look, we just started shipping the product. I mean Fitbit Charge 2 is the number one bestselling fitness tracker on Amazon. Ah, you know, we launched two other great products earlier this year, Alta and Blaze. And if you remember the investor reaction to Blaze was I think, just, I couldn't understand it all and even today Blaze is the number one selling smartwatch on Amazon.

124.   Later in the interview, Park again joined Cramer in questioning the reliability of negative analyst reports:

Cramer:   Well, the reason I ask is because I think that the holiday season could be a good one but I find that sometimes it's dictated by what the analysts say and what I'm trying to takeaway here is that you shouldn't let the analysts – we're not letting the analysts speak for the stock, let the numbers of the company itself determine how the stock does.

Park:   Yeah, we're looking out for shareholders and we want to stay true to our mission at the same time. We're in it to win it.

---

[4] *Mad Money* was ranked the 83rd most popular cable news program in October 2016, with an average viewership between September 26, 2016 and October 28, 2016 reported at 108,000. https://www.adweek.com/tvnewser/the-top-cable-news-programs-for-october-2016-were/309592/

125.     The day following Park's October 6, 2016 interview with Cramer, *TheStreet* reported that another research firm, Cleveland Research, released a note stating that new product uptake is muted and that it is concerned about inventory levels of the Charge 2.

126.     In an article published on October 7, 2016 – the same day Cleveland Research issued its note regarding inventory accumulation of the Charge 2 – *TheStreet* questioned the accuracy of these channel check reports, instead quoting Park's interview from the day prior with Jim Cramer on *Mad Money*, during which he stated that the company had "just started shipping the product" and that "Fitbit Charge 2 is the number one, best-selling fitness tracker on Amazon" right now. In light of Park's suggestion that the Pacific Crest was not credible, *TheStreet* expressed skepticism, noting, "So, how can channel checks truly judge demand when the product is just hitting the market and consumers are still learning about it? Sure, they can provide insight, but they won't necessarily reveal the whole picture, as was clearly evident with Apple's iPhone 7 release."

127.     Park's statements questioning the reliability of the channel check reports and reassuring investors that Fitbit was looking out for shareholders' best interest in the holiday season were false and/or misleading because the channels were saturated with Charge 2 inventory and sales were lagging due to the Flex 2 shipment delays, supply constraints, and the Charge 2 quality control issues.

128.     By the time Park was interviewed by Cramer on October 6, 2016, he knew or recklessly disregarded that the Charge 2 products that were shipped in mid-September 2016 were not selling as expected and that inventory was in fact building beyond sustainable levels. As further detailed above:

(a)     By October 6, 2016, Defendants knew or recklessly disregarded that inventory levels of the Charge 2 were high because Fitbit had an excess supply of Charge 2 products in Q3 2016. Zerella admitted on February 22, 2017 that "[s]hipments late in Q3 had the effect of pulling forward revenue from the fourth quarter, but in turn, building our inventory in the channel" and that "[w]ith demand less than forecast, inventory built further." And Zerella admitted on November 2, 2016: "I think the good news is, we've got *now* adequate Charge 2 in the channel as

we head into the holidays." Moreover, during the Q4 2016 earnings call on February 22, 2017, Park also admitted having "entered the fourth quarter [starting on October 1, 2016] anticipating a high level of demand and built-out inventory," thereby further admitting that he knew of the increased inventory.

(b)     Defendants knew or recklessly disregarded that demand for the Charge 2 had flattened by the time of the Cramer interview because Zerella admitted during the investor presentation held on December 6, 2016 at the Raymond James Technology Investors Conference that Defendants knew demand had already flattened by October 2016:

> So in terms of Q4 guidance, what we started seeing in Q3 and a continuation in October was some flattening of demand. . . . But we have seen some flattening and the question gets to be is this a temporary pause or is this something that indicates, at least in the US, some maturation in terms of penetration models.

(c)     The Charge 2 was one of two of Fitbit's core new products for the holiday season, replacing the Charge HR, and Fitbit's fourth quarter and full-year 2016 revenue depended on how well the Charge 2 would sell. As Park explained on the Q3 2016 earnings call on November 2, 2016, "Blaze, Alta, Charge 2 and Flex 2 – represented 79% of revenue in the quarter." And as the risk warnings in the Q2 2016 Form 10-Q state, "the success" of the Charge 2 depended on "inventory levels." Given the importance of the products to the Company's financial results and guidance and of inventory levels to the product's success, it is reasonable to assume that Defendants knew or recklessly disregarded that the Pacific Crest and Cleveland Research reports were correct.

129.     By the time Park was interviewed by Cramer, he and the other Defendants knew or recklessly disregarded that sales on the new products were either already lagging behind projections due to the Flex 2 delays and supply constraints and the Charge 2 bugs and/or defects or that there was a significant risk they would. As further detailed below:

(a)     Shipments of the Flex 2 were already supposed to have been completed by the time of the Cramer interview, but instead the product did not start shipping until early October 2016, around the time of the Cramer interview, and could not be shipped in sufficient quantities to meet expected demand. Defendants themselves blamed the Flex 2 shipment delays and supply constraints on the lack of battery. Therefore, Defendants knew or recklessly disregarded that

the delay in shipment and the supply constraints of the Flex 2 were already starting to cause sales to lag behind the Company's projections, which were the basis for Fitbit's guidance. As Zerella admitted a month later on the Q3 2016 earnings call on November 2, 2016, the Flex 2 production issues had caused the Company to lose "$50 million in terms of [its] revenue for the quarter." He also stated on that call that these Flex 2 supply issues would only be solved at the end of December 2016. Therefore, it is reasonable to assume that, as soon as the Company started shipping the Flex 2 in limited quantities, Defendants knew that demand was not being met and would not be met until the end of December 2016.

(b)     As explained in ¶ 60, ten days after the Cramer interview, the Company admitted that there were software bugs in the Charge 2 device that had resulted in inaccurate distance tracking and issued a software update to fix the pace and distance tracking issues. It is therefore reasonable to assume that because of these bugs and/or defects, Defendants knew or recklessly disregarded that sales of the Charge 2 were already lagging and/or that there was a strong risk they would continue to lag through the holiday season.

130.    On November 3, 2016, following Fitbit's revised guidance on November 2, 2016, Jim Cramer stated on CNBC's *Squawk on the Street* that Park "has lost any credibility" and that "Fitbit is now done." Cramer called it "a travesty" because, when had confronted Park a month prior on October 6, 2016 about the Pacific Crest report showing Charge 2 sales had dropped, he refuted that by "looking at how it was doing on Amazon" "and making judgment" but "[o]bviously that was not the tell" and he was "not in touch with how his company is selling the product." Cramer explained in an article published that same day that:

> Speaking of fitting, you know who has no credibility? James Park of Fitbit (FIT). . . . Last night, Park came out with numbers that were horrendous and a forecast that was even worse. ***This is astounding to me because last month, mind you, I interviewed Park and when I asked him about channel checks that were showing dramatic weakness for his products, he dismissed them out of hand, referring to how well his products were doing on Amazon***.

### E.    Post-Black Friday Investor Presentation

131.    On November 2, 2016 (a month into Q4 2016), Fitbit lowered its full-year revenue guidance from between $2.5 and $2.6 billion to between $2.320 billion and $2.345 billion and

issued its fourth year 2016 guidance, expecting revenue between $725 million and $750 million. During the Q3 2016 earning call on November 2, 2016, Zerella admitted that the "shortfall" was driven by a few factors, including "softness in overall demand" and "Flex 2 supply constraints, which [Fitbit] expect[s] will result in approximately $50 million of unsold demand."

132.   However, although the guidance was lowered to account for some softness in demand and the battery issue with the Flex 2, Defendants did not fully reveal the extent of the issues plaguing the Charge 2. They failed to reveal that the Charge 2 was not just subject to a general softness in demand, but that inventory of the product had greatly accumulated in the channels and that the demand was much lower than expected because it had not been in line with shipping commitments and reorders had been lower.

133.   On December 6, 2016, Fitbit held an investor presentation at the Raymond James Technology Investors Conference. Zerella attended and gave the presentation. A representative for Raymond James attended and participated in the presentation, which was later opened up to audience members for questions. A transcript became publically available to analysts and investors.

134.   During the December 6, 2016 presentation, Zerella reaffirmed the lower guidance and stated that Fitbit was still on track to meet its lower guidance with a few big weeks coming up to sell products:

> So in terms of Q4 guidance, what we started seeing in Q3 and a continuation in October was some flattening of demand. In our case, we are primarily a (inaudible) category since our market share in connected fitness is about 80% and that's held pretty steady. There are other definitions of the market that we play in. The broader wearables market, which includes a bunch of other things like store watches, our share has been around 24%, 25% and that's stayed pretty consistent as well. But we have seen some flattening and the question gets to be is this a temporary pause or is this something that indicates, at least in the U.S., some maturation in terms of penetration models. We do know that about two-thirds of people are interested in their health and fitness, and right now in the U.S., about 15% to 20% of consumers have purchased one of these devices. So there's a pretty big gap between stated interest level in health and fitness versus people (inaudible) devices. ***So we have yet to see how that will play out for the holidays. Actually, we still have a few more pretty big weeks coming between now and the end of the year***.

135.   Zerella's statements reaffirming the lower guidance and noting that Fitbit was still on track to meet its guidance were false and or misleading because he failed to disclose that the Black Friday product reorders had not occurred and been lower than expected, that prior shipping against

commitments had not been in line with expected sell-throughs, and that inventory levels were higher than expected.

136.     By December 6, 2016, Zerella knew or recklessly disregarded that demand for its products had been lower than expected and the revised guidance was yet again overstated. As further detailed below:

(a)     Defendants knew or recklessly disregarded that the reorders that followed Black Friday had been lower than expected and thus that the demand for the Company's products on which the Company's lower guidance was based was lower than projected. As admitted on the Q3 2016 earnings call on November 2, 2016, "the reorders happen right after Black Friday going into the early part of December, and then it trails off pretty significantly." Therefore, by December 6, 2016 – a week after Black Friday – as they knew that reorders had already failed to materialize, Defendants knew that the post-Black Friday reorders had been lower than expected. As Park admitted on the Q4 2016 earnings call on February 22, 2017, lower demand had led to "lower reorder rates":

> Higher channel inventory, coupled with weaker demand, led to a contraction in unit growth of 21% in the quarter, and flat pricing year-over-year. Revenue in the quarter was further impacted by $42 million in rebates and seller allowances, which were booked as a contra revenue. Shipments late in Q3 had the effect of pulling forward revenue from the fourth quarter, but in turn, building our inventory in the channel. ***With demand less than forecast, inventory built further, leading to lower re-order rates and the subsequent dampening of revenue growth.*** Charges related to excessive inventory and the change in demand, materially impacted gross margins. Gross margins in the quarter were 22.4%. We recorded a $78 million write-down of tooling equipment and component inventory and a $41 million increase in return reserves, due to higher channel inventory. In addition, we also increased our warranty reserves by $17 million for legacy products. On a full-year basis, gross margin declined 9 points year-over-year to 39%, and was below our previous 46% target.

(b)     Defendants knew or recklessly disregarded that shipments up to and including Black Friday had not been reflective of actual demand because the commitments against which they were shipping had not been in line with expected sell-throughs, despite the promotional activities held during Black Friday. Prior to the post-Black Friday reorders, the Company was shipping against early purchase commitments that Defendants knew were not reflective of actual end user demand for Fitbit's products. These shipments supported sales through Black Friday. As Zerella

noted in the Q3 2016 earnings call on November 2, 2016, "[t]here's typically heavy shipments in October [and] November" "that support[] Black Friday." These "purchase commitments," as explained in the Company's 2015 Form 10-K filed with the SEC on February 29, 2016, were "based on our purchase orders and demand forecasts for certain amounts of finished goods, works-in-progress, and components purchased in order to support such purchase orders and forecasts" and purchase orders "represent authorizations to purchase rather than binding agreements." On the February 22, 2017 earnings call, Zerella admitted that those commitments had not been in line with expected sell-throughs:

> So I mean, there were already committed orders from retailers to replenish, that we shipped against, based upon anticipated sell-through, which didn't materialize to the level that we or our retail partners anticipated. So therein, the result was, we exited the year with a lot more inventory in the channel, than either us or our retail partners had expected.

And on January 30, 2017, the Company issued a press release lowering its guidance and admitting that they had "experienced softer-than-expected holiday demand for trackers in [its] most mature markets, especially during Black Friday." Park also stated on the Q2 2016 earnings call on August 2, 2016 that Black Friday was "the predominant place where [Fitbit] does promotions" and Zerella stated on the November 2, 2016 earnings call, that the Company "provide[s] a lot of support to [its] channel partners for Black Friday." Thus, Defendants knew or recklessly disregarded the fact that sales were lagging even during Black Friday, one of the key sales periods for Fitbit, despite the increased marketing expenses. In fact, Park admitted on the February 22, 2017 call that demand in Q4 2016 was lagging and that the reason they increased promotional activity was because demand was lagging during Q4 2016:

> Second, we increased promotional activity. We entered the fourth quarter anticipating a high level of demand and built-out inventory. With demand less than expected and facing an intense competitive environment, we responded with discounting. Consumers responded and we saw an uptick in purchases. However with inventory levels high, our revenue growth trajectory lagged sell through obscured true consumer demand.

137.    Defendants knew or recklessly disregarded that inventory was higher than expected as of December 6, 2016. As Zerella admitted on the Q4 2016 earnings call on February 22, 2017, Fitbit experienced "[h]igher channel inventory, coupled with weaker demand" in Q4 2016. He

further explained that "[s]hipments late in Q3 had the effect of pulling forward revenue from the fourth quarter, but in turn, building our inventory in the channel" but that "[w]ith demand less than forecast, inventory built further." Defendants also knew or recklessly disregarded that, as Ben Bollin of Cleveland Research noted on January 10, 2017, there were "some concerns partners may not get paid for all of the product they have built because demand is so weak" and that "[p]artners had to completely stop production for Fitbit because they are swimming in product."

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

138.   The Individual Defendants acted with scienter by virtue of: (a) their failure to disclose their inability to find a small enough battery for the Flex 2; and/or (b) their failure to disclose that due to the lack of battery, there was a significant risk that the Flex 2 would not ship on time and in sufficient quantities to meet the demand on which the revenue guidance was based; and/or (c) their receipt of information reflecting the Company's knowledge of the inventory accumulation of, lack of demand and low reorders for the Charge 2; and/or (d) their intentional issuance of materially false or misleading revenue guidance which improperly included sales of the Flex 2 that were not going to occur due to the lack of battery; and/or (e) their internal issuance of materially false or misleading margin guidance, which improperly failed to take into account the increased production costs of the Flex 2; and/or (f) their touting the features, technical achievements, accuracy and market opportunities of the Flex 2 while failing to disclose the lack of battery; and/or (g) their touting the features, technical achievements, accuracy and market opportunities of the Charge 2 while failing to disclose the bugs and/or defects plaguing the device; and/or (h) their intentional reaffirming of the lowered guidance that improperly includes sales of the Charge 2 that were not going to occur due to the lack of demand, lack of reorders and inventory accumulation; and/or (i) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so. The Individual Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

139.    The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiffs and the Class.

### A.    The Company's 2016 Financial Success Was Tied to the Sale of Its New Products During the Holiday Season

140.    By the start of the Class Period, Fitbit relied on new product introductions for its continued sales and revenues. As the Company explained in its 2015 annual report, "product introductions have had a significant, positive impact on [Fitbit's] operating results due primarily to increases in revenue associated with sales of the new products in the quarters following their introduction." As Zerella noted on the November 2, 2016 earnings call, "new product introductions can have a material impact on [Fitbit's] revenue linearity" and create a "big impact in terms of the quarterly cadence of [Fitbit's] revenue." According to Park on the November 2, 2016 earnings call, "[f]ocused R&D that results in amazing products" was one of the three pillars "to ignite future growth." In its Q2 2016 Form 10-Q, Fitbit explained that it "must continually develop and introduce new products, including trackers and accessories, and services and improve and enhance [its] existing products and services to maintain or increase [its] sales."

141.    As such, the Company had moved toward a model where new products were introduced at key points in the year. As explained by Brad Samson on August 29, 2016, "what [Fitbit has] said consistently over the past couple quarters is that [it is] moving towards a pattern that maybe looks more like this year, where you have new products introduced in time for Mother's Day, Father's Day, and some new products introduced in time for the holidays." Samson further noted during the September 14, 2016 presentation that the Company was "hopeful that the cadence that [it has] this year of spring and fall introductions may become [its] more normal type of thing" and that the Company "envisioned, in general, a something like 12- to 18-month generally kind of product cycle to replace or refresh things in the product lineup."

142.     The Company was, as Park stated on August 2, 2016, "launching the largest number of new products available for Q4 of this year in the Company's history, so that's a very positive sign from [Fitbit] for the holiday quarter."

143.     Fitbit's largest and most important financial quarter is its fourth fiscal quarter because holiday sales make up a disproportionate amount of the Company's yearly revenue. As the Company's 2015 annual report explained:

> Our business is affected by general seasonal spending trends associated with holidays. For example, our fourth quarter has typically been our strongest quarter in terms of revenue, reflecting our historical strength in sales during the holiday season. ***We generated approximately 38%, 50%, and 40% of our full year revenue during the fourth quarters of 2015, 2014, and 2013, respectively***.

Even Zerella, on the November 2, 2016 earnings call, stressed the "important holiday season." For the 2016 holiday season, the Charge 2 and the Flex 2 were the only new product introductions and the sales of these products had already been included in the Company's financial guidance. As Zerella made clear on August 29, 2016, "our guidance certainly incorporated these products since they've been on the roadmap and these are being released as previously planned." As such, Fitbit relied on the success and rollout of the Flex 2 and the Charge 2 for its vital holiday season to meet its fourth quarter and full-year 2016 revenue guidance which incorporated the expected sales of these products.

144.     Given the central importance of new products to Fitbit's financial success, it may be inferred that the Individual Defendants were contemporaneously aware of the particulars and status of the production, sales and inventory of the new products on which the Company's success relied. This is particularly true when the relevant time period (Black Friday and the Christmas season) was the most important sales period of the entire year for the Company. If the Company's executives, including Park and Zerella, were unaware of issues relating to the manufacturing, sales and inventory of these new products, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and other Class members.

**B.    Fitbit Executives Were Promptly Informed of the Defects with Fitbit's Products**

145.    During the Class Period, Fitbit claimed that the Company "has performed and continues to perform internal studies to extensively test the accuracy of" its products. In fact, Samson at the Deutsche Bank Technology Conference on September 14, 2016 explained in response to a question regarding the Charge 2's software that the Company's products "are already pretty accurate" because Fitbit "spent three years of R&D and testing before [Fitbit] actually brought them to market, so [the Company was] pretty confident in them, lawsuits notwithstanding and that limits some of what we can say." Samson further explained that "[t]here's a continuous R&D cycle going on there among software engineers, in fact that's kind of funny because we have a little work-out area that's right off of kind of the main lunch room and it's really not for people to work out and it's for the engineers who are testing the new algorithm tweaks they're making to go find out how they work." And when Fitbit issued its software update to correct the bugs and/or defects with the Charge 2, it noted that the Company "has performed and continues to perform internal studies to extensively test the accuracy of its products."

146.    If Fitbit had performed the research and development, internal studies and testing that it claimed to have done, then the Company and its executives would have been aware of the technological issues with its products in real time—including that one of its most important products, the Flex 2, lacked a working battery and that another of its core products, that the Charge 2, was beset with technical bugs and/or defects such as inaccurate pace and distance tracking—that negatively impacted its usability. As such, the most logical inference is that Defendants had uncovered bugs and/or defects with the Flex 2 and Charge 2 during the Company's research and development and internal testing of the products during the Class Period prior to the release of the Charge 2 and Flex 2.

**VII.    MARKET EFFICIENCY, DAMAGES AND LOSS CAUSATION**

147.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and the Class.

148.    During the Class Period, Defendants materially misled the investing public through the misrepresentations and omissions alleged above, which caused the publicly-traded price of Fitbit securities to be higher than it would have been in the absence of the fraud alleged herein. These material misstatements and/or omissions created an unrealistically positive assessment in the market of the Company and of its operations and financial performance, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**A.      Market Efficiency**

149.    Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Fitbit securities and market information relating to Fitbit, and have been damaged thereby.

150.    The market for Fitbit securities was open, well developed and efficient at all relevant times for the following reasons, among others:

(a)      Fitbit securities met the requirements for quotation and/or listing, and was quoted and/or listed and actively traded and/or quoted on the NYSE, a highly efficient marketplace;

(b)      As a regulated issuer, Fitbit filed periodic public reports with the SEC;

(c)      Fitbit regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      Fitbit was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace

151.   As a result of the foregoing, the market for Fitbit securities promptly digested current information regarding Fitbit from all publicly available sources and reflected such information in Fitbit's stock price. Under these circumstances, all purchasers of Fitbit securities during the Class Period suffered similar injury through their purchase of Fitbit securities at artificially inflated prices and a presumption of reliance applies.

**B.     Representative Corrective Events**

152.   The fraud-caused inflation in the price of Fitbit's securities was eliminated through a series of partial disclosures that revealed the circumstances, conditions or risks concealed by the fraud alleged herein, or the impact of those circumstances, conditions and risks on Fitbit's financial condition and results. The disclosures that caused Fitbit's stock price to be corrected to eliminate fraud-caused inflation include those identified below. Additional corrective events may be identified through discovery and expert analysis.

153.   The truth regarding Fitbit's financial condition and/or business operations was partially revealed, and/or the concealed risks materialized, on or about: November 2, 2016, January 10, 2017 and January 30, 2017. As a direct result of these partial disclosures, the price of Fitbit's securities declined precipitously on heavy trading volume:



154.    The timing and magnitude of these price declines in Fitbit securities negate any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Fitbit securities and the subsequent significant decline in the value of Fitbit securities when Defendants' prior misrepresentations and fraudulent conduct were revealed.

### 1.    November 2, 2016 Corrective Event

155.    On November 2, 2016, after the close of the market, Fitbit issued a press release entitled, "Fitbit Reports Third Quarter Revenue Growth of 23% to $504M, GAAP Diluted EPS of $0.11, and Non-GAAP Diluted EPS of $0.19," in which the Company disclosed that it was greatly decreasing the Company's financial guidance for the rest of the year from $2.5 to $2.6 billion to $2.320 to $2.345 billion. The Company, in relevant part, disclosed:

> Fitbit, Inc. (NYSE:FIT), the leader in the connected health and fitness market, today reported revenue of $504 million, GAAP diluted net income per share of $0.11, non-GAAP diluted net income per share of $0.19, GAAP net income of $26 million, and Adjusted EBITDA of $81 million, for its third quarter of 2016.
>
> \*       \*       \*
>
> Revenue increased 23% year-over-year to $504 million
>
> \*       \*       \*
>
> **Business Outlook**
>
> - Full year 2016:
>   The company expects revenue between $2.320 billion and $2.345 billion, representing growth of 25%-26%, with non-GAAP earnings per diluted share in the range of $0.55 to $0.59, and a non-GAAP tax rate of approximately 34%.
>
> - Fourth quarter 2016:
>   The company expects revenue between $725 million and $750 million, representing growth of 2%-5%, with non-GAAP earnings per diluted share in the range of $0.14 to $0.18, and a non-GAAP tax rate of approximately 33%.

156.    On that same day, Fitbit held its Q3 2016 earnings call in which Park admitted that the reduced financial guidance was due in part to a general softness in demand. Park further

admitted that the decrease in guidance was due to the fact that Fitbit did not have batteries that were small enough for the Flex 2, and, as such, needed to invent automated production processes to produce the product. As Park stated:

> Really, the root cause of the Flex 2, even though it looks like a fairly simple device, it's actually one of the more complex devices that we have designed and developed, and that's due to its incredibly tiny form factor. So it's -- I think the smallest activity tracking device on the market. And that small form factor made it incredibly difficult to swim-proof the device. It was incredibly difficult to find batteries that were small enough to fit in the device. And so it was small enough that we actually had to move to a fully automated production process using robotics to manufacture that product. So there was a lot of things that we had to invent and learn along the way, resulting in you could say a non-optimal initial production process.

157.    Since the Company did not have the batteries for the Flex 2 product, Fitbit was unable to timely manufacture the inventory needed to satisfy demand during the quarter, which resulted in approximately $50 million of unfilled demand. As Zerella explained on the call:

> Basically, what happened at the end of Q3 was channel inventories went down in Flex, and we weren't able to replenish at the level we anticipated in terms of Flex 2.

> But that will all be remedied by the end of the year. The issue is not having adequate -- at least our expectation is not have adequate inventory in the channel to support peak demand, which is why we see an impact of about $50 million in terms of our revenue for the quarter.

158.    On this news, Fitbit's share price fell $4.30 per share, or 33.6%, to close at $8.51 per share on November 3, 2016, on unusually heavy trading volume, thereby removing some, but not all, of the artificial inflation in Fitbit's stock price

159.    The November 2, 2016 disclosures revealed that: (i) shipment of the Flex 2 had been delayed as a result of the lack of a suitable battery for the device; (ii) Fitbit's sales and margins had suffered as a result of the delayed shipment, supply constraints and of previously unreported manufacturing problems that increased costs due to excess waste and scrap materials in the manufacture of the product; and (iii) the Company's forecast guidance had been based on unsupported expectations that Flex 2 would be shipped at the end of Q3 in time to support forecast demand when, in fact, the Company had no ability to provide retailers with sufficient inventory to meet forecast demand, resulting in a belated reduction of $50 million in forecast guidance

160.   The November 2, 2016 disclosures also revealed "some softening of demand" for Fitbit's products, but the corrective impact of that disclosure was significantly reduced as a result of Defendants' omission to disclose that: (i) inventories of Charge 2 products were significantly higher than expected, (ii) the demand for the Charge 2 had not been in line with prior shipping commitments, and (iii) restocking orders were lower than expected, such that the lack of demand for Fitbit's products was in fact much greater than revealed on the conference call. As a result, Fitbit's stock price continued to trade at artificially inflated levels thereafter.

161.   On November 3, 2016, analyst Ralph Schackart of William Blair issued a report recognizing that the drastic decline in Fitbit's stock price was directly related to the updated guidance resulting from the slower demand for the Charge 2 and Flex 2 and the "supply disruption" for the Flex 2, which was due to the lack of a sufficient battery:

> Fourth-quarter revenue guidance was 25% below consensus on revenue and 79% below consensus on EPS; soft demand for new products and supply chain disruptions weigh heavily on the guide.

*     *     *

> The stock is down over 25% in after-hours trading, as the company provided guidance for the seasonally strong fourth quarter that was well below consensus estimates. As a result, full year 2016 revenue, EBITDA, and EPS guidance was also guided considerably lower and well below our model due to several factors. Most notable is the softer-than-expected demand for new products, specifically the Charge 2 and Flex 2. Moreover, the company experienced a supply disruption with its Flex 2 product that led to waste and gross margin degradation that is expected to persist through the fourth quarter.

### 2.     January 10, 2017 Corrective Event

162.   On January 10, 2017, analyst Ben Bollin of Cleveland Research issued a note on Fitbit, citing subdued sell-through and heightened inventory as risk contributors for Q4 2016. The note further suggested unit shortfall in Q1 2017 from lack of new products, stating, in relevant part: "The start of the year has been bad with Fitbit. . . . There are some concerns partners may not get paid for all of the product they have built because demand is so weak. . . . Partners had to completely stop production for Fitbit because they are swimming in product."

163.    On this news, Fitbit's common stock declined $0.46 per share, almost 6%, to close on January 10, 2017 at $7.33 per share, on heavy trading volume, partially removing additional inflation from Fitbit's stock price.

164.    The Cleveland Research note revealed that: (i) inventories of Charge 2 products were significantly higher than expected and in fact they were so high that Fitbit's partners had to halt production; and (ii) the demand was so weak that Fitbit's partners were not getting paid.

165.    The corrective impact of that disclosure was, however, reduced because it did not disclose that Black Friday sales had been lower than expected despite the promotional activity and that restocking orders following Black Friday had been lower than expected such that the lack of demand for Fitbit's products was in fact much greater than revealed on the earnings call and that Fitbit's sales had dropped significantly.

### 3.    January 30, 2017 Corrective Event

166.    On January 30, 2017, the Company issued a press release entitled, "Fitbit Announces Preliminary Fourth Quarter 2016 Results." Therein, the Company, in relevant part, stated:

> Fitbit, Inc. (NYSE: FIT), the leader in the connected health and fitness market, today announced preliminary financial results for the fourth quarter ended December 31, 2016.
>
> **Based upon preliminary financial information, Fitbit expects to report 6.5 million devices sold and revenue for the fourth quarter of 2016 to be in the range of $572 million to $580 million, compared to the company's previously announced guidance range of $725 million to $750 million.** For the full-year 2016, Fitbit expects annual revenue growth to be approximately 17% from the previous forecasted growth of 25% to 26%. Non-GAAP diluted net loss per share for the fourth quarter is expected to be in the range of ($0.51) to ($0.56) compared to the previously announced guidance range of non-GAAP diluted net income per share of $0.14 to $0.18. The non-GAAP effective tax rate is expected to be materially higher than prior guidance. For the full-year 2016, Fitbit expects to earn approximately $32 million in non-GAAP free cash flow and have approximately $700 million in cash, cash equivalents, and marketable securities on its balance sheet. Fourth quarter results are subject to change based on the completion of the company's customary year-end audit review process.
>
> "**Fourth quarter results are expected to be below our prior guidance range**; however, we are confident this performance is not reflective of the value of our brand, market-leading platform, and company's long-term potential. **While we have experienced softer-than-expected holiday demand for trackers in our most mature markets, especially during Black Friday**, we have continued to grow rapidly in select markets like EMEA, where revenue grew 58% during the fourth quarter. To address this reduction in growth and what we believe is a temporary slowdown and

transition period, we are taking clear steps to reduce operating costs. Looking forward, we believe Fitbit is in a unique position to stimulate new areas of demand by leveraging the data we collect to deliver a more personalized experience while developing upgraded versions of existing products and launching additional products to expand into new categories," said James Park, Fitbit co-founder and CEO. "As the overall wearable category leader, we exited the year with an engaged community of over 23.2 million active users, making us uniquely positioned to be the partner of choice for the healthcare ecosystem, which is a key component of our long-term strategy."

Fitbit is taking direct action to reduce the expense basis of the company while maintaining necessary investments to drive future growth and maintain its global leadership position in the wearables market.

- Targeting a reduction in the 2016 exit operating expense run rate of approximately $200 million, to approximately $850 million for 2017, which includes realigning sales and marketing spend and improved optimization of research and development investments.

- Conducting a reorganization of its business, including a reduction in force, that will impact approximately 110 employees, constituting approximately 6% of the company's global workforce, creating a more focused and efficient operating model. The cost of these reorganization efforts is expected to be approximately $4 million to be recorded in the first quarter of 2017.

"We believe the evolving wearables market continues to present growth opportunities for us that we will capitalize on by investing in our core product offerings, while expanding into the smartwatch category to diversify revenue and capture share of the over $10 billion global smartwatch market," said Park. "We believe we are uniquely positioned to succeed in delivering what consumers are looking for in a smartwatch: stylish, well-designed devices that combine the right general purpose functionality with a focus on health and fitness. With the recent acquisition of assets from Pebble, Vector Watch and Coin, we are taking action to position the company for long-term success."

***The company expects non-GAAP fourth quarter gross margin to be materially below its previously issued 46% guidance due to excess inventory and other related charges as follows:***

- ***One-time write downs of tooling equipment and component inventory of approximately $68 million.***

- ***Increased rebates and channel pricing promotions of approximately $37 million which is recorded as a reduction in revenue.***

- ***Increased return reserves of approximately $41 million due to greater channel inventory.***

- ***Increased warranty reserves for legacy products of approximately $17 million.***

167.    On this news, Fitbit's common stock declined by $1.15 per share, or 15.95%, to close on January 30, 2017 at $6.06 per share, on unusually heavy trading volume, eliminating the rest of the Class Period inflation of Fitbit's stock price.

168.    The January 30, 2017 disclosures finally revealed that: (i) Fitbit's sales had suffered as a result of the weaker than expected demand during the holidays, including Black Friday; and (ii) Defendants had not taken into account the drop in sales, lower reorders, weaker than expected demand and higher than expected inventory levels when issuing and restating the guidance through the Company's lowered Q4 2016 guidance from $725-$750 million to $572-$580 million and Fitbit's disclosure that expected annual revenue growth would be "approximately 17% from the previous forecasted growth of 25% to 26%."

## VIII.   CLASS ACTION ALLEGATIONS

169.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Fitbit securities between August 2, 2016 and January 30, 2017, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

170.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fitbit securities were actively traded and quoted on the NYSE, a highly efficient marketplace. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Hundreds of thousands of Fitbit shares were traded publicly during the Class Period, demonstrating an active and broad market for Fitbit securities and permitting a strong presumption of an efficient market. Record owners and other members of the Class may be identified from records maintained by Fitbit, or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

171.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

172.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

173.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, management, and prospects of Fitbit; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

174.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

175.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

176.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and

other members of the Class to purchase Fitbit securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

177.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Fitbit securities in violation of Section 10(b) of the Exchange Act and Rule 10b 5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

178.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Fitbit's business, operations, management, and prospects, as specified herein.

179.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Fitbit's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fitbit and its operations and financial results, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

180.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities

as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

181.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Fitbit's business, operations, management and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's operations and actual or expected results throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

182.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Fitbit securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during

the Class Period, Plaintiffs and the other members of the Class acquired Fitbit securities during the Class Period at artificially high prices and were damaged thereby.

183.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Fitbit was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Fitbit securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

184.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

185.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

186.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

187.    The Individual Defendants acted as controlling persons of Fitbit and its employees, including Samson and Chase, within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases,

public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

188.    In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

189.    As set forth above, Fitbit and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 24, 2019

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Casey E. Sadler*
Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
lglancy@glancylaw.com
rprongay@glancylaw.com
csadler@glancylaw.com
prajesh@glancylaw.com

*Lead Counsel for Plaintiffs and
the Class*

**ROBBINS GELLER RUDMAN
    & DOWD LLP**
Dennis J. Herman
Caroline M. Robert
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  (415) 288-4545
Facsimile:  (415) 288-4534
dherman@rgrdlaw.com
crobert@rgrdlaw.com

**THE SCHALL LAW FIRM**
Brian Schall
Sherin Mahdavian
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile: (310) 388-0192
brian@schallfirm.com
sherin@schallfirm.com

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867
howardsmith@howardsmithlaw.com

*Additional Counsel for the Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On June 24, 2019, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 24, 2019, at Los Angeles, California.

*s/ Casey E. Sadler*
Casey E. Sadler